Juan A. MARRERO and Maria Marrero,
Plaintiffs-Appellants,

v.

CITY OF HIALEAH, etc. et al.,
Defendants-Appellees.

No. 78–2391.

United States Court of Appeals,
Fifth Circuit.

Aug. 4, 1980.

Joseph C. Brannen, Miami, Fla., for plaintiffs-appellants.

Fowler, White, Burnett, Hurky, Banick & Knight, P. A., Miami, Fla., for City of Hialeah.

Fred R. Ober, Michael J. Murphy, Miami, Fla., Stuart Simon, Roy Wood, Ralph C. Rocheteau, III, Asst. County Attys., Miami, Fla., for Reno and Rashkind.

Before GOLDBERG, CHARLES CLARK and THOMAS A. CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

Juan and Maria Marrero appeal from the district court's dismissal, for failure to state a claim upon which relief can be granted, of their suit against the City of Hialeah, Florida, and two state prosecutors for alleged violations of their civil rights. Their appeal presents three questions relating to suits brought pursuant to 42 U.S.C. § 1983 (1976).[1] We are asked to decide: (a) wheth-

1. 42 U.S.C. § 1983 (1976) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitu-

er a state prosecutor is absolutely immune from liability for damages under § 1983 when he engages in unlawful conduct outside his quasi-judicial roles of initiating and conducting prosecutions; (b) whether the allegations of appellants' complaint are sufficient to state a claim against the municipality under § 1983 for the acts of its police officers; and (c) whether appellants' claim of injury to their personal and business reputations caused by persons acting under color of state law is actionable under § 1983.

## I.  Background

A.  *Allegations of the Complaint.*  Since appellants are appealing from the district court's dismissal of their suit for failure to state a claim upon which relief can be granted, we accept as true the factual allegations of their complaint, together with such reasonable inferences as may be drawn therefrom in their favor. *See, e. g., Mann v. Adams Realty Co.,* 556 F.2d 288 (5th Cir. 1977).  The complaint alleges the following material facts.

On June 22, 1976, several officers of the Police Department of the City of Hialeah, Florida, executed a warrant authorizing a search for stolen items in a jewelry store operated by appellants and owned by a corporation of which appellants were the sole officers and shareholders.  The police officers were accompanied by Paul Rashkind, Assistant State Attorney for Dade County, Florida.  After their search uncovered none of the items listed in the warrant, the officers conferred with Rashkind, whereupon several victims of local robberies were brought to the store to aid in identification of stolen goods.  Only one victim could identify any of the jewelry as stolen.  She identified an item which was described in the search warrant as a "gold bracelet with brown stones," after which the officers again conferred with Rashkind and then seized almost the entire stock of jewelry on the premises and arrested appellants for receipt of stolen property in violation of Florida law.

This entire sequence of events was covered by representatives of all channels of the local television media, who had arrived at appellants' store simultaneously with the police officers and Rashkind.  At the time of the arrests, the Hialeah Police Department and Rashkind announced to the media that over $75,000 in stolen property had been recovered in the raid and that appellants had been arrested.

Some time later, the Hialeah Police Department caused the issuance of an announcement in local newspapers and on local radio stations that the stolen property had been recovered from appellants' store and that victims of the robberies should come to the police station to identify their property.  After the public had the opportunity to view the property, appellants were charged by information in state court with receipt of stolen property.  The state court judge granted their motion to suppress all of the seized evidence, except for the gold bracelet.  All of the suppressed items were subsequently returned to appellants, and, as of the date they filed their complaint, no further action had been taken against them.

B.  *Proceedings Below.*  On February 22, 1978, appellants brought this suit in federal district court pursuant to 42 U.S.C. § 1983 (1976), seeking damages against the City of Hialeah, Assistant State Attorney Rashkind, and Janet Reno, who was the State Attorney for Dade County, Florida, on the date the complaint was filed but not at the time of the events which form the basis of appellants' complaint.  Appellants alleged that the City, through its agents, servants and employees, Rashkind, and Reno, "willfully and knowingly abused the Search and Seizure Laws of the United States" in violation of appellants' fourth amendments rights, and slandered appellants' personal and business reputations in violation of the fourteenth amendment.  Appellants alleged that as a result of these actions, their personal and business reputations have been

tion and laws, shall be liable to the party injured in an action at law, suit in equity, or

other proper proceeding for redress.

destroyed and they have been deprived of their right to earn a living.

On May 16, 1978, the district court dismissed appellants' suit for failure to state a claim upon which relief can be granted. Relying on *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the court held that the City of Hialeah was not subject to suit under § 1983, and, relying on *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the court held that Reno and Rashkind were absolutely immune from suit.

## II. *Issues on Appeal*

On appeal, appellants contend that the district court erred in dismissing their suit against Rashkind since a prosecutor is not entitled to absolute immunity when he engages in activities of the kind alleged here.[2] With respect to the claims against the City, appellants contend that the case should be remanded with leave to amend their complaint in light of *Monell v. Department of Social Services of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which was decided after the district court entered its order of dismissal. Appellees oppose both of these contentions, and, in addition, argue that even if they are subject to suit, the claim of injury to appellants' personal and business reputations must be dismissed since it does not state a cause of action under § 1983.

### A. *Prosecutorial Immunity*

The basis of the district court's dismissal of appellants' suit against Assistant State Attorney Rashkind was its interpretation of *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). In *Imbler*, the Supreme Court held that a state prosecutor is immune from damages liability under § 1983 for alleged civil rights violations committed in the course of "initiating a prosecution and presenting the State's case." *Id.* at 431, 96 S.Ct. at 995. The Court, however, expressly left open the question of whether the policies that mandate absolute immunity extend to "those

aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of an advocate." *Id.* at 430–31, 96 S.Ct. at 995.

Today we have occasion to consider that question because, as we conclude *infra*, the prosecutorial activities complained of here do not fall within the sphere of quasi-judicial activity protected by *Imbler*. Before undertaking our inquiry, however, we set forth the basic principles from which we proceed.

Since § 1983 by its very terms admits of no immunities, but rather imposes liability upon "every person" who, under color of state law, deprives another of his civil rights, courts are naturally loathe to clothe any person with an immunity which would frustrate the statute's design of providing vindication to those wronged by the misuse of state power. *See Owen v. City of Independence*, —— U.S. ——, ——, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980); *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 2908–11, 57 L.Ed.2d 895 (1978); *Scheuer v. Rhodes*, 416 U.S. 232, 243–48, 94 S.Ct. 1683, 1690–92, 40 L.Ed.2d 90 (1974). Hence, immunities are extended to government officials only when "overriding considerations of public policy nonetheless deman[d] that the official be given a measure of protection from personal liability" to ensure his ability to function effectively. *Owen v. City of Independence, supra*, —— U.S. at ——, 100 S.Ct. at 1416; *see Butz, supra*, 98 S.Ct. at 2909; *Wood v. Strickland*, 420 U.S. 308, 320, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975); *Scheuer, supra*, 416 U.S. at 243–47, 94 S.Ct. at 1690–92. Moreover, even when a measure of protection is given to an official, the policy in favor of protecting the individual's right to compensation normally mandates that only a qualified immunity be granted. *See Butz, supra*, 98 S.Ct. at 2909–11; *Scheuer, supra*, 416 U.S. at 248, 94 S.Ct. at 1692. Thus, only in

---

2. Although appellants argued in their brief on appeal that the district court also erred in dismissing their suit against Reno, appellants conceded in oral argument before this court that they did not have a cause of action against her.

"exceptional situations" do the special functions of an official require the protection of an absolute shield from liability. *See Butz, supra,* 98 S.Ct. at 2911–12.

Proceeding from these premises, we now turn to the question of the level of immunity to be accorded Rashkind. In conducting our inquiry, we are guided principally by the Supreme Court's analysis of the nature of prosecutorial immunity in *Imbler,* and its refinement of that analysis in its more recent decision on the doctrine of official immunity, *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).[3]

In determining the level of immunity to which a prosecutor is entitled, the Supreme Court in *Imbler* rejected the approach of simply ascertaining whether the prosecutor

was acting within the bounds of his authority.[4] Instead, the Court emphasized that the inquiry must focus upon "the functional nature of the activities rather than [the prosecutor's] status." *Imbler, supra,* 424 U.S. at 430, 96 S.Ct. at 995. The Supreme Court utilized this same functional analysis in *Butz* in determining the levels of immunity to which federal executive officials are entitled. After identifying the rationales underlying qualified and absolute immunity, the Court held that absolute immunity extends to officials of the executive branch when they initiate and participate in adjudications before administrative agencies but that otherwise those same officials are entitled to only a qualified immunity.[5] *See Butz, supra,* 98 S.Ct. at 2911, 2915.

3. In *Butz,* the Supreme Court addressed the issues of what levels of immunity are to be accorded various officials in the executive branch of the federal government. Justice White, writing for the majority, summarized and organized much of the law on the doctrine of official immunity, and in so doing, clarified the reasons which underlay the Court's holding in *Imbler. See Butz, supra,* 98 S.Ct. at 2912–14, 2916 n. 40. The majority opinion in *Butz* also adopted much of the reasoning of Justice White's concurrence in *Imbler* concerning the basic reasons which justify absolute immunity. *Compare Butz, supra,* 98 S.Ct. at 2912–16, *with Imbler, supra,* 424 U.S. at 435–41, 96 S.Ct. at 997–1000 (White, J., concurring).

4. In several pre-*Imbler* cases, this court held that a prosecuting attorney is absolutely immune from suit if he is acting within the scope of his authority. *See, e. g., Madison v. Purdy,* 410 F.2d 99 (5th Cir. 1969); *Lewis v. Brautigam,* 227 F.2d 124 (5th Cir. 1955). Relying on these earlier cases, Rashkind argues that since, under Florida law, he is directed to investigate crimes, he was acting within the scope of his authority when he participated in the search and seizure, and thus is absolutely immune from suit. It is precisely this approach which the Supreme Court rejected in *Imbler,* and in determining the scope of a prosecutor's immunity since *Imbler,* we have followed that case's approach of examining the character of the particular prosecutorial conduct alleged. *See, e. g., Henzel v. Gerstein,* 608 F.2d 654, 657 & n. 4 (5th Cir. 1979); *Humble v. Foreman,* 563 F.2d 780, 781 (5th Cir. 1977); *Bruce v. Wade,* 537 F.2d 850, 852 (5th Cir. 1976).

Of course, if an official is acting outside the scope of his authority, he is entitled to no immunity at all. *See Butz, supra,* 98 S.Ct. at 2905; *Barr v. Matteo,* 360 U.S. 564, 575, 79

S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959); *Spalding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896). We leave for future proceedings in the district court the determination of the extent to which Rashkind was acting within the scope of his authority. For our purposes, we need proceed no further than answering the initial question of whether, assuming the activities were within the scope of his authority, Rashkind is entitled to absolute immunity. Since we conclude that a prosecutor, when acting within the bounds of his discretionary authority, is entitled to only a qualified, rather than absolute, immunity for the types of activities challenged here, *see* pp. 506–511, *infra,* appellants have stated a claim upon which relief can be granted. It then remains for the trial court, upon development of the facts, to determine, with respect to each challenged activity, whether Rashkind was acting within or outside the scope of his discretionary duties, and accordingly, whether he is entitled to qualified immunity or no immunity at all. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 239, 242–43, 94 S.Ct. 1683, 1686, 1688, 1689–90, 40 L.Ed.2d 90 (1974).

5. The Court stated that federal executive officials are entitled to absolute immunity only in "those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." *Butz, supra,* 98 S.Ct. at 2911. Although this language suggests that absolute immunity may extend to officials other than those performing quasi-judicial activities, thus far quasi-judicial officers are the only officers to which the Court has extended absolute immunity in suits involving violations of constitutional rights and the policies underlying the immunity indicate that such officials are probably the only officials to

Therefore, since our inquiry centers on the nature of the official behavior challenged and not the status or title of the officer, we begin by isolating the particular prosecutorial conduct of which appellants complain. Obviously, if we determine that that conduct is quasi-judicial in nature, our inquiry ceases since the conduct falls within the sphere of a prosecutor's activity given absolute protection in *Imbler*. However, if the conduct is not quasi-judicial, then appellants have stated a claim upon which relief can be granted unless absolute immunity also extends to a prosecutor's activity which falls outside the shelter of *Imbler*.[6]

1. *The challenged activities fall outside the* Imbler *umbrella.*

The particular prosecutorial activities of which appellants complain are two: Rashkind's alleged participation in the allegedly illegal search and seizure, and Rashkind's alleged slandering of appellants. Neither of these activities falls within the sphere of activity for which prosecutors were given absolute immunity in *Imbler*. Although the

*Imbler* Court acknowledged that it will often be difficult to determine whether a particular prosecutorial activity is "investigative or administrative" rather than "quasi-judicial,"[7] here we have little difficulty determining that the activities challenged are outside the scope of a prosecutor's quasi-judicial duties.

First, Rashkind's participation in the allegedly illegal search and seizure occurred not only outside the courtroom but prior to the initiation of any judicial proceedings against appellants. Although some activities which a prosecutor undertakes prior to an indictment may be classified as quasi-judicial, such as interviewing grand jury witnesses, *see Cook v. Houston Post*, 616 F.2d 791 (5th Cir. 1980), a prosecutor who assists, directs or otherwise participates with, the police in obtaining evidence prior to an indictment undoubtedly is functioning more in his investigative capacity than in his quasi-judicial capacities of "deciding which suits to bring and . . . conducting them in court."[8] *Imbler, supra,*

which extension of the immunity is justified. *See* pp. *507–510, infra.*

6. Determination of whether the district court correctly dismissed appellant's claim that Rashkind slandered them requires resolution not only of the issue of the scope of absolute immunity but also of the question of whether the slander alleged here constitutes a deprivation of a civil right and thus is actionable under § 1983. We have reserved this second issue for later discussion. *See* pp. *512–520, infra.*

7. The Supreme Court stated:
  We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the *initiation of the criminal process and for a* trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administra-

tor rather than as an officer of the court. Drawing a line between these functions may present difficult questions, but this case does not require us to anticipate them.
*Imbler, supra,* 424 U.S. at 430 n. 33, 96 S.Ct. at 995.

8. In *Imbler*, the Supreme Court indicated that a prosecutor's participation in a search and seizure constitutes investigative, rather than quasi-judicial, activity. In explaining that it was not deciding whether absolute immunity extends to "those aspects of the prosecutor's responsibility that cast him in the role of administrator or investigative officer rather than that of an advocate," *Imbler, supra,* 424 U.S. at 430–31, 96 S.Ct. at 995, the Court cited as cases involving instances of investigative activity *Guerro v. Mulhearn*, 498 F.2d 1249 (1st Cir. 1974) and *Hampton v. City of Chicago*, 484 F.2d 602 (7th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974). Both of these cases dealt with prosecutors assisting the police in allegedly unlawful searches and seizures. Indeed, if the activity complained of here does not fall within a prosecutor's investigative role, it is difficult to imagine what conduct would constitute investigative activity on the part of a prosecutor.
  Reading the complaint in the case at bar favorably to appellants, as we are required to do, we construe it to charge that Rashkind partici-

424 U.S. at 424, 96 S.Ct. at 992. *Accord, Jacobson v. Rose*, 592 F.2d 515 (9th Cir. 1978), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979); *Apton v. Wilson*, 506 F.2d 83 (D.C.Cir.1974); *Guerro v. Mulhearn*, 498 F.2d 1249 (1st Cir. 1974); *Hampton v. City of Chicago*, 484 F.2d 602 (7th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); *Lofland v. Meyers*, 442 F.Supp. 955 (S.D.N.Y.1977).

■ Second, Rashkind's alleged slandering of appellants also falls outside the sphere of activity given absolute protection in *Imbler*. The defamatory statements attributed to Rashkind occurred outside the confines of the courtroom and were unrelated to any judicial proceeding. Hence, the well established doctrine affording prosecutors absolute immunity from suits for defamatory remarks made during a judicial proceeding, *see Imbler, supra*, 424 U.S. at 426 n. 23, 96 S.Ct. at 993 n. 23; *id.* at 439, 96 S.Ct. at 998 (White, J., concurring), is not applicable here. Moreover, the statements Rashkind is alleged to have made were not made in connection either with the initiation of a prosecution or with activities undertaken in following up a prosecution. Rather, the alleged statements were essentially those of an investigating officer informing the press of activities occurring at the scene of a crime. Thus, the statements were not "intimately associated with the judicial phase of the criminal process," *id.* at 430, 96 S.Ct. at 995, and, accordingly, are not sheltered by *Imbler*.

Therefore, since the activities complained of here do not fall within the sphere of activity for which prosecutors were given absolute immunity in *Imbler*, Rashkind is not entitled to absolute immunity unless that level of immunity applies to a prosecutor engaged in activities outside his quasi-judicial functions.

**2. Absolute immunity does not extend to a prosecutor's non-judicial activities.**

Implicit in the Supreme Court's decision in *Butz* is the answer to the question the Court left unresolved in *Imbler, i. e.*, whether a prosecutor is entitled to absolute immunity when he acts in roles other than his quasi-judicial role. In *Butz*, the Supreme Court delineated the circumstances in which officials of federal executive agencies are entitled to absolute immunity from suits for damages arising from violations of individuals' constitutional rights. After explicating the policy reasons underlying absolute and qualified immunity, the Court held that these officials are entitled to absolute immunity when they engage in discretionary, quasi-judicial activities before administrative agencies, but that, otherwise, these same officials are entitled to only a qualified immunity. *See Butz, supra*, 98 S.Ct. at 2911, 2915–16. In particular, the Court found that agency officials who initiate administrative proceedings are performing functions analogous to that of a prosecutor seeking an indictment, and that an agency attorney who participates in agency hearings performs a role similar to that of a prosecutor advocating at a trial. *See id.* at 2916. The Court thus concluded that to the extent they engage in these quasi-judicial activities, federal executive officials are entitled to absolute immunity, *see id.* at 2914–16, but when they engage in activities outside their quasi-judicial roles, they are entitled to only a qualified immunity. *See id.* at 2911.

■ The Supreme Court's holding in *Butz* resolves the issue before us. Even though *Butz* was a suit, authorized by *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), against federal officials for violations of constitutional rights, while *Imbler* was a § 1983 suit against a state official for violations of

---

pated with the police officers in making the search and, in doing so, advised them regarding its execution. We do not, therefore, consider the degree of immunity to which a prosecutor would be entitled if he merely gave *legal* advice

from his office in response to specific inquiries from police officers, although *Imbler* and *Butz* indicate that the same type of functional analysis we employ here must also be utilized in that situation.

constitutional rights, *Butz'* reasoning is fully applicable to the determination of the levels of immunity to be accorded state officials. The Court devoted a substantial part of its opinion in *Butz* to a discussion of the need for symmetry of treatment between federal officials and their state counterparts. *See Butz, supra,* 98 S.Ct. at 2905–10. The Court reasoned that "there is no basis for according to federal officials a higher degree of immunity from liability when sued for a constitutional infringement as authorized by *Bivens* than is accorded state officials when sued for the identical violation under § 1983." *Id.* at 2907–08. We believe the logical converse is also true: there is no reason for according to state officials a higher degree of immunity when sued for a constitutional infringement under § 1983 than is accorded federal officials when sued for the identical violation in a *Bivens* action. Therefore, since "it is untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials," *id.* at 2909–2910, disposition of the issue before us is controlled by *Butz.* Just as the Court in *Butz* held that federal executive officials are not entitled to absolute immunity when they engage in roles other than their quasi-judicial roles, we now similarly hold that state prosecutors are not entitled to absolute immunity when they perform functions other than their quasi-judicial functions of "initiating prosecutions and presenting the State's case." *Imbler, supra,* 424 U.S. at 431, 96 S.Ct. at 995.

The rationales underlying absolute immunity fully support this conclusion. In *Imbler* and *Butz,* the Supreme Court identified two reasons [9] which undergird the doctrine of absolute immunity, and, as demonstrated below in connection with the activities complained of here, neither reason justifies extension of the immunity to a prosecutor's activities that are not quasi-judicial in nature.

First, the Court explained that the "special nature" of the responsibilities of those engaged in the judicial process requires that such persons be accorded absolute immunity when they participate in that process. *See Butz, supra,* 98 S.Ct. at 2912–14; *Imbler, supra,* 424 U.S. at 423, 96 S.Ct. at 991. The prosecutor's immunity is derived from the absolute immunity accorded judges and grand jurors, an immunity necessitated by the concern that these actors in the judicial process—required by law to make important decisions regarding the initiation, conduct, and merit of controversies which often excite "the deepest feelings" of the parties—would be intimidated in the exercise of their discretion by the fear of retaliatory lawsuits brought by angry defendants. *See Butz, supra,* 98 S.Ct. at 2913–4; *Imbler, supra,* 424 U.S. at 425, 96 S.Ct. at 992. A prosecutor's fear of liability could, in a variety of ways, seriously undermine the criminal justice system's goal of accurately determining the guilt or innocence of defendants. *See Butz, supra,* 98 S.Ct. at 2913; *Imbler, supra,* 424 U.S. at 426, 96 S.Ct. at 993. Fear of retaliatory suits could deter a prosecutor from initiating prosecutions except in the most "air-tight" of cases. *See Imbler, supra,* 424 U.S. at 426 n. 24, 96 S.Ct. at 993 n. 24. Even after initiating a suit, a prosecutor, uncertain of the veracity of witnesses, might be tempted by the threat of personal liability to forego presenting their testimony, thereby denying the triers of

**9.** In *Imbler,* the Supreme Court appeared to identify a third consideration supporting absolute immunity, namely, the fact that prosecutors act under "serious constraints of time and even information," which inevitably force them to make many decisions that could engender colorable claims of civil rights violations. *Imbler, supra,* 424 U.S. at 424–25, 96 S.Ct. at 992. In *Butz,* however, the Court explicitly rejected this reason as being central to its decision in *Imbler,* "for the same might be said of a wide variety of state and federal officials who enjoy only a qualified immunity." *Butz, supra,* 98 S.Ct. at 2916 n. 40. Obviously, if the Court had grounded its decision in *Imbler* on this practical consideration, there would be no reason not to extend absolute immunity to other government officials, thereby undercutting the very purpose of § 1983. *See Imbler, supra,* 424 U.S. at 436–37, 96 S.Ct. at 997–98 (White, J., concurring).

fact relevant evidence.[10] *See id.* at 426, 96 S.Ct. at 993. Moreover, fear of the personal consequences could dampen the prosecutor's exercise of his duty to bring forth exculpatory evidence discovered after a conviction. *See id.* at 427 n. 25, 96 S.Ct. at 993 n. 25. Hence, to the extent prosecutors play an integral role in the judicial process, namely, by "deciding which suits to bring and [by] conducting them in court," *id.* at 424, 96 S.Ct. at 992, it is indispensable to the independence and effectiveness of that process that they be accorded the same absolute immunity as are judges and grand jurors. *See Butz, supra*, 98 S.Ct. at 2914.

However, when a prosecutor acts outside his quasi-judicial role, he is not making decisions comparable to those of a judge or grand juror. Thus, subjecting him to liability for such decisions will not interfere to the same degree with the effective functioning of the criminal judicial system. Only discretion that is quasi-judicial in nature requires absolute insulation from suit because only such discretion is so crucial to the effectiveness of the truth-finding process to outweigh the countervailing policy that government officials should be subject to suit for violations of civil rights. *See* pp. 503–504, *supra*. For instance, when a prosecutor makes an investigative decision, such as whether to conduct a search and seizure,[11] he is making a decision essentially comparable to that of a policeman. With respect to such decisions, the Supreme Court has determined that a qualified immunity adequately preserves the official's ability to function. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1966). We can perceive no reason why prosecutors deserve greater protection for the same kind of decisions, for, as we have previously stated, it is the official *function* that determines the degree of immunity required, not the *status* of the acting officer.[12] *See* pp. 504–505, *supra*.

10. This concern was well expressed by Justice White in his concurring opinion in *Imbler*:

It is precisely the function of a judicial proceeding to determine where the truth lies. The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal . . . cases are such that those involved in judicial proceedings should be "given every encouragement to make a full disclosure of all pertinent information within their knowledge." 1 Harper & James § 5.22 p. 424 . . . . [I]t is very difficult if not impossible for attorneys to be absolutely certain of the objective truth or falsity of the testimony which they present. A prosecutor faced with a decision whether or not to call a witness whom he believes, but whose credibility he knows will be in doubt and whose testimony may be disbelieved by the jury, should be given every incentive to submit that witness' testimony to the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies. 424 U.S. at 439–40, 96 S.Ct. at 999 (White, J., concurring). •

11. We use a decision of how to search simply for illustrative purposes here. We by no means imply that investigative decisions are limited to the example given. Rather, as the alleged facts here demonstrate, a prosecutor's investigative function may encompass a wide range of decisions made in the course of participating in, or assisting or directing others with respect to, a criminal investigation, including decisions as to when, and the manner in which, a search and/or seizure shall be conducted.

12. Arguably, the imposition of liability upon a prosecutor for participating in an illegal search and seizure could interfere with the prosecutor's performance of his quasi-judicial duties. A prosecutor could perhaps be deterred from seeking an indictment or from presenting relevant evidence at trial out of fear that he would be subject to suit if the judge ruled that the evidence had been seized illegally. However, at least two considerations militate against the extension of absolute immunity to such investigative conduct. First, as explained *supra*, the nexus between the judicial process and a decision to search is sufficiently attenuated that extension of absolute immunity to such a decision is not justified. Under *Imbler*, a prosecutor is given absolute immunity for his decision to present certain evidence at trial. However, extension of absolute immunity to a prosecutor's decision to engage in a search and seizure on the ground that protection of that decision would further protect his decisions at trial could serve as a carte blanche for prosecutorial abuse without any certainty of a counter-balancing benefit to the judicial process. Second, as discussed *infra*, the safeguards inherent in the judicial system do not accompany a prosecutor when he engages in investigative activity, and thus there is a greater need for private damage actions in order to curb prosecutorial

Similarly, imposing liability upon a prosecutor for making defamatory statements outside his quasi-judicial role would not interfere with the independence of his quasi-judicial functions of deciding which suits to bring and conducting them in court. Because of a paramount concern for the airing of all evidence, a prosecutor understandably is given an absolute privilege for any of his courtroom statements relevant to the subject matter of the proceedings. *See Imbler, supra*, 424 U.S. at 426 n. 23, 96 S.Ct. at 993 n. 23. Obviously, however, this purpose is not furthered when a prosecutor defames an individual while acting outside his quasi-judicial role.[13]

The second reason justifying absolute immunity for prosecutors engaged in quasi-judicial activities is that "the safeguards built into the judicial system tend to reduce the need for private damage actions as a means of controlling unconstitutional · conduct." *Butz, supra*, 98 S.Ct. at 2914. The judicial system reduces the need for individual suits as a means of vindicating constitutional rights in two ways. First, the checks inherent in the judicial process serve to restrain prosecutorial abuse. Throughout the conduct of the trial, the prosecutor operates under the watchful eye of the judge and in the shadow of the ever-present possibility of judge-imposed sanctions. In addition, the prosecutor is restrained by knowledge not only that his assertions will be fully tested by his adversary, but also that his conduct may lead to error which could re-

sult in mistrial or reversal of a conviction on appeal. Second, to the extent that prosecutorial abuse does occur, the judicial process provides its own mechanisms for mitigating any damaging effects. The adversary nature of the process, the impartiality and independence of the judge and jurors, the rigors of cross-examination, the penalty of perjury to which witnesses are subject, and the correctability of error on appeal all operate automatically, without the need of special invocation, to enhance "the reliability of information and the impartiality of the decision-making process," *id.*, thereby reducing the need for private actions to correct constitutional error. *Id. See also Apton v. Wilson*, 506 F.2d 83, 93–94 (D.C. Cir.1974).

However, when a prosecutor steps outside the confines of the judicial setting, the checks and safeguards inherent in the judicial process do not accompany him, and thus there is greater need for private actions to curb prosecutorial abuse and to compensate for abuse that does occur. No surveillance comparable to that of a judge serves to check a prosecutor's zeal when he makes statements about individuals outside the courtroom or when he engages in investigative activities of directing, advising, assisting, or participating with, the police in obtaining evidence. Moreover, when a prosecutor engages in unconstitutional conduct outside the courtroom, absent are the remedies which the judicial process by its nature provides for illegal conduct occurring with-

abuse which occurs outside the judicial system. Unlike prosecutorial misconduct which occurs within the confines of the judicial process, unconstitutional conduct which occurs outside that process may never be subject to judicial scrutiny unless individuals are allowed to bring private actions. *See* pp. 509–510, *infra*.

**13.** It bears repeating that we are referring only to defamations that result in deprivations of civil rights and thus are actionable under § 1983. *See* n. 6, *supra*, & pp. 512–520, *infra*. Hence, not dispositive of the issue before us are the Supreme Court decisions in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) and *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), in which the Court held that federal executive officials are absolutely immune from common

law tort actions for defamatory statements made within the scope of their discretionary duties. As the Court itself explained in *Butz*, "the liability of officials who have exceeded constitutional limits was not confronted in either *Barr* or *Spalding*." *Butz, supra*, 98 S.Ct. at 2894. The Court's holding in *Butz* indicates · that, outside the judicial system, when constitutionally guaranteed rights, rather than common law rights, are at stake, the individual's right to redress for infringement of these rights overrides the government's interest in an absolute immunity. Otherwise, the *Butz* Court easily could have extended the holding in *Barr* to provide a blanket immunity for federal officials when they commit not only common law torts but also torts which involve violations of constitutional rights.

in the process. When a prosecutor makes false allegations against a defendant in the course of a trial, the opposing counsel is available to counteract immediately the damaging statements and an impartial panel of jurors is present to sift through the allegations and evidence to determine where the truth lies. Similarly, when a prosecutor engages in illegal conduct in the course of a trial, the judge, the jury, the opposing counsel, the witnesses, and the appellate process all serve in differing ways to mitigate the impact of that conduct. No comparable self-remedying mechanisms, however, exist outside the judicial phase of the criminal process, and thus there is more compelling need for private actions to serve as a means of vindicating constitutional rights.

Therefore, in light of the Supreme Court's decision in *Butz*, and supported by the policies underlying absolute immunity, we conclude that a prosecutor is not entitled to absolute immunity when he engages in activities outside his quasi-judicial role. *Accord, Hampton v. Hanrahan*, 600 F.2d 600, 631–33 (7th Cir. 1979), *cert. denied on relevant grounds, rev'd in part on other grounds,* —— U.S. ——, 100 S.Ct. 1868, 64 L.Ed.2d 214 (1980); *Jacobson v. Rose*, 592 F.2d 515, 524 (9th Cir. 1978), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979); *Briggs v. Goodwin*, 569 F.2d 10, 21 (D.C.Cir.1977), *cert. denied*, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); *Apton v. Wilson*, 506 F.2d 83, 93–94 (D.C.Cir.1974); *Guerro v. Mulhearn*, 498 F.2d 1249, 1256 (1st Cir. 1974); *Hampton v. City of Chicago*, 484 F.2d 602, 608–09 (7th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); *Robichaud v. Ronan*, 351 F.2d 533, 536–37 (9th Cir. 1965); *J. D.*

*Pflaumer, Inc. v. United States Department of Justice*, 450 F.Supp. 1125, 1134–35 (E.D. Pa.1978); *Lofland v. Meyers*, 442 F.Supp. 955, 958 (S.D.N.Y.1977). As our preceding analysis demonstrates, although the *Imbler* umbrella may be necessary to shield a prosecutor from a rain of private suits challenging the performance of his quasi-judicial duties, there simply is no reason to construct a canopy to cover a prosecutor's activities which lie outside his role as advocate.[14] Hence, the district court erred in holding that the immunity doctrine requires dismissal, without trial, of appellants' charges against Rashkind.

### 3. *Rashkind may be entitled to qualified immunity.*

Even though Rashkind is not entitled to absolute immunity for the activities complained of here, he may be entitled to a lower level of immunity. Although the determination of the scope and level of immunity to which Rashkind may be entitled with respect to each challenged activity must await the development of the facts at trial, *see* n. 4, *supra*, we set forth here the principles which should guide the trial court in making its determination. We address each challenged activity separately.

First, a prosecutor who participates in a search and seizure is essentially performing functions analogous to those of a policeman ferreting out crime and consequently is making the same kinds of decisions which a policeman makes. Hence, to the extent Rashkind was acting within the scope of his duties by participating in the search and seizure, he should be entitled to the same qualified immunity which the Supreme Court has determined is both necessary and sufficient to preserve the ability of

---

14. Our decision here is supported by our previous decisions. Although this is the first occasion we have explained in detail the reasons supporting our decisions on the scope of absolute immunity, we have previously held that a prosecutor is not entitled to absolute immunity for activities which fall outside his quasi-judicial role. *See, e. g., Henzel v. Gerstein*, 608 F.2d 654, 657 & n.4 (5th Cir. 1979) (variety of allegedly unlawful acts connected with prosecutor's commencement, pursuit and appeal of prosecution were within prosecutor's advocatory role, but alleged attempt by prosecutor to persuade prisoner to sign affidavit in which he agreed not to sue state officials, in return for parole, was not within scope of absolute immunity); *Slavin v. Curry*, 574 F.2d 1256, 1264–65, *modified on other grounds*, 583 F.2d 779 (5th Cir. 1978) (presentation of evidence to grand jury and request that defendant's bond be cancelled are protected by absolute immunity, but alleged alteration of trial transcript is not).

police officers to function effectively. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1966).

█ Second, to the extent a prosecutor is authorized, as part of his discretionary duties, to make public statements, he should be entitled to assert a qualified immunity defense in § 1983 actions challenging those statements. An official who, as a part of his discretionary functions, is charged with making public statements would be unduly inhibited in the exercise of that duty if he were not afforded some degree of immunity for statements issued in the discharge of his duty. In *Scheuer, supra*, the Supreme Court explained that the doctrine of qualified immunity in § 1983 actions rests on two mutually dependent rationales:

(1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligation of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.

*Id.*, 416 U.S. at 240, 94 S.Ct. at 1688. Both rationales apply to a prosecutor's statements to the press which he is authorized to make as a part of his discretionary duties. Moreover, the strong public policy in favor of the free flow of information concerning the affairs of government and the apprehension of criminals supports the grant of a limited privilege, lest the public be deprived of significant information due to an official's reluctance to speak.[15] Hence, to the extent Rashkind made the statements to the press in the exercise of his discretionary duties, he is entitled to assert a qualified immunity defense.[16]

---

**15.** We note that in the context of the common law tort of defamation, the Supreme Court has held that first amendment guarantees preclude the imposition of liability upon defendants without fault. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Although additional considerations certainly come into play in § 1983 actions for violations of constitutional rights, the first amendment interest provides additional support, along with the policies underlying qualified immunity, to granting a measure of protec-

### B. *Municipal Liability*

The district court dismissed appellants' claim against the City of Hialeah on the ground that under *Monroe v. Pape*, 365 U.S. 167, 187–92, 81 S.Ct. 473, 484–87, 5 L.Ed.2d 492 (1961), the City was not "a person" within the meaning of § 1983. Although the district court was correct at the time it entered its order of dismissal, the Supreme Court has since overruled this holding of *Monroe*. *See Monell v. Department of Social Services of New York*, 436 U.S. 658, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). In so doing, however, the Supreme Court concluded that cities were not to be held liable to the same extent as other employers:

Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."

*Id.* at 2036.

█ The City of Hialeah argues that, even in light of *Monell*, dismissal of appellants' complaint for failure to state a claim upon which relief can be granted is proper because the complaint is devoid of any allegations that the alleged deprivations of appellants' civil rights were caused by city employees carrying out any municipal policy or custom. We are inclined to agree with appellee on this point, since, even construed most favorably to appellants, the complaint seeks to hold the City of Hialeah liable on a theory of vicarious liability. No-

tion to government officials when they make public statements.

**16.** We express no opinion as to whether a prosecutor may lose his qualified privilege through abuse of the privilege. *Cf.* Restatement (Second) of Torts §§ 593, 598A, 603–05 (1976) (conditional privilege of inferior state officials in tort actions for defamation may be lost if the official abuses the privilege by, for example, excessive publication).

where in the complaint is it alleged that any of the allegedly unlawful actions of the police officers were undertaken pursuant to an official or unofficial city policy or custom, nor can such be inferred from this single alleged incident of unlawful conduct.

However, since *Monell* was handed down after the district court's decision, we believe that the best course is to remand this aspect of the case and allow appellants leave to amend. The Federal Rules of Civil Procedure provide that leave to amend "shall be freely given when justice so requires," Fed. R.Civ.P. 15(a), and granting leave to amend is especially appropriate in cases, such as this, in which the trial court has dismissed the complaint for failure to state a claim. *See Griggs v. Hinds Junior College*, 563 F.2d 179 (5th Cir. 1977). Since appellant certainly had no reason to anticipate the holding of *Monell* and the appellees would not be unduly prejudiced if appellants were allowed leave to amend, "justice requires" that appellants be given the opportunity to amend their complaint to state a cause of action against the City in conformity with the requirements of *Monell. See, e. g., Bryan v. Austin*, 354 U.S. 933, 77 S.Ct. 1396, 1 L.Ed.2d 1527 (1951) (per curiam) (case remanded with leave to amend complaint in light of change in state law occurring after district court decision).

### C. *Injury to Reputation*

Having determined that Rashkind is not absolutely immune from suit for activities conducted outside his role as advocate and that the City of Hialeah may possibly be subject to suit, we now address the final issue presented on this appeal. Appellees contend that, regardless of their amenability to suit, the claim of injury to appellants' personal and business reputations was properly dismissed since it does not state a cause of action under § 1983. Relying on *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), appellees contend that injury to reputation does not state a cause of action under § 1983 because such injury does not amount to deprivation of a liberty or property interest protected by the Constitution.

Although appellees are correct in their general observation that, in order to maintain a § 1983 action, a plaintiff must allege conduct depriving him of a right, privilege or immunity secured by the Constitution or laws of the United States, they err in interpreting *Paul* as foreclosing recovery for injury to reputation under the circumstances presented here. Because *Paul* is of seminal importance to our resolution of this issue, we first examine the case in detail, and then explore its applicability to the facts before us.

### 1. *The Pale of* Paul

In *Paul, supra,* the Supreme Court faced the narrow question of whether a citizen's charge of defamation, "standing alone and apart from any other governmental action with respect to him, stated a claim for relief under 42 U.S.C. § 1983 and the Fourteenth Amendment." *Id.* at 694, 96 S.Ct. at 1157. The suit arose from the inclusion of plaintiff Davis' name and photograph in a flyer of "active shoplifters," which two police chiefs had distributed to eight hundred local merchants. Although Davis had been charged with shoplifting approximately eighteen months earlier, he had not been brought to trial at the time the flyer was circulated, and in fact the charge was dismissed shortly thereafter. *See id.* at 694–97, 96 S.Ct. at 1157–59. Even though he had not been fired from his job, Davis asserted that the circulation of his name and picture on the flyer would impair his future employment opportunities and interfere with his ability to enter and shop in local businesses. *Id.* at 697, 96 S.Ct. at 1158. Nevertheless, the Court held that Davis' reputation *alone* was neither liberty nor property for constitutional purposes and hence that defamation by the state officials, standing alone, was not actionable under § 1983. *See id.* at 712, 96 S.Ct. at 1165.

The Court reached its holding through a two-step process. First, the Court held that reputation, standing alone, is not a liberty interest recognized by *federal* law. *See id.* at 700–02, 96 S.Ct. at 1160–61. The Court reasoned that a federally recognized liberty

interest is implicated only when an individual's reputation is stigmatized in connection with the denial of some specific constitutional guarantee or some "more tangible" interest.[17] *See id.* at 700–01. Second, the Court found that under the applicable *state* law, reputation was not a liberty or property interest, and thus any harm or injury inflicted by the State could not constitute an unconstitutional deprivation of the interest.[18] *See id.* at 711–12, 96 S.Ct. at 1165–66.

Thus, *Paul* simply holds that no liberty or property interest is infringed when the *only* loss suffered at the hands of the government is damage to personal reputation if personal reputation is not recognized by the relevant state law as a liberty or property interest. The holding of *Paul* does not require the dismissal of appellants' claims of injury to their personal and business reputations because, on at least four independent grounds, appellants' claims, unlike those in *Paul,* do involve deprivations of constitutionally protected interests.

### 2. Beyond the Pale

#### a. Injury to reputation caused by the illegal search and seizure

Appellants have alleged that they suffered injury to their personal and business reputations not only as a result of the defamatory statements made by Rashkind and the City of Hialeah Police, but also as a result of the unlawful search and seizure. To the extent appellants' reputations were injured as a result of the latter action, defamation is not the basis of the § 1983

---

**17.** With respect to this latter requirement, the Court stated that its previous line of cases did "not establish the proposition that *reputation alone, apart from some more tangible interests* such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause." *Id.* at 701, 96 S.Ct. at 1161 (emphasis added). In reaching its result in *Paul,* the Court distinguished such cases as *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (stating that it involved injury to reputation plus denial of right to attend school); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (plus refusal to rehire); *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (plus loss of right to buy liquor); and *United States v. Lovett,* 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) (plus prohibition from future government employment). However, the Court indicated that the "plus" of the stigma-plus requirement need not itself be a protected liberty or property interest. The Court so indicated by its reaffirmation of *Roth,* in which the Court had suggested that a liberty interest would have been infringed if stigma to reputation had occurred in conjunction with the failure to rehire the plaintiff, a non-tenured teacher who had no property interest in his job. *See Paul, supra,* 424 U.S. at 709, 96 S.Ct. at 1164; *Roth, supra,* 408 U.S. at 573, 92 S.Ct. at 2707. As explained by the seventh circuit:

> [I]nfliction of a stigma to reputation accompanied by a failure to rehire (or, *a fortiori,* by a discharge) states a claim for deprivation of liberty without due process within the meaning of the Fourteenth Amendment. . . . We reach this conclusion because on the facts of *Roth* itself the Supreme Court found that the plaintiff respondent had no claim of

entitlement to, or property interest in his job. *Roth, supra,* 408 U.S. at 578, 92 S.Ct. 2701. Since the Court in *Paul v. Davis* specifically approved the *Roth* dictum concerning stigma to reputation, it follows that stigma to reputation (not itself a deprivation of liberty as defined in the Fourteenth Amendment) plus failure to rehire or discharge (not necessarily involving deprivation of property as defined in the Fourteenth Amendment) may nevertheless when found *in conjunction* state a claim under 42 U.S.C. § 1983 for deprivation of a Fourteenth Amendment liberty interest without due process.

*Colaizzi v. Walker,* 542 F.2d 969, 973 (7th Cir. 1976), *cert. denied,* 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977), *quoted with approval in Dennis v. S & S Consolidated Rural High School District,* 577 F.2d 338, 342 (5th Cir. 1978).

**18.** The Court explained:

> Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a result of petitioners' actions. Rather his interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where as here inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws.

*Paul, supra,* 424 U.S. at 711–12, 96 S.Ct. at 1165–66.

action. Rather, the injury to reputation is simply an element of the damages suffered as a result of the violation of appellants' fourth amendment rights. Therefore, damages for injury to reputation caused by the unlawful search and seizure are recoverable.

Although the Supreme Court in *Paul* held that a charge of defamation alone does not state a claim under § 1983, the Court did not even suggest that injuries to personal and business reputations flowing from a violation of a protected right are not compensable under § 1983. Here appellants have alleged violation of their fourth amendment rights. This violation, as the Court acknowledged in *Paul*, is actionable under § 1983. *See Paul, supra*, 424 U.S. at 700, 711 n.5, 96 S.Ct. at 1160, 1165 n.5 (reaffirming the holding of *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that deprivation of a fourth amendment right, which is incorporated into the fourteenth amendment, is actionable under § 1983). Hence, to the extent the unconstitutional conduct *caused* injury to appellants' personal or business reputations, the injury is compensable as an element of damages flowing from the unlawful conduct.[19] *Accord, Davis v. Murphy*, 559 F.2d 1098 (7th Cir. 1977); *Collier v. Bachman*, 421 F.Supp. 869 (E.D.Mich.1976).

b. *A protected interest in goodwill*

The Supreme Court acknowledged in *Paul* that had state law extended to Davis "any legal guarantee of present enjoyment of reputation," the defamation alone, without deprivation of any other interest, would be actionable under § 1983. *See Paul, supra*, 424 U.S. at 711, 96 S.Ct. at 1165. Although Florida law may not recognize personal reputation as a liberty or property interest,[20] it does recognize business reputation, at least to the extent it approximates goodwill, as a property interest. Florida has long extended its protection to the intangible interests of a business. Under Florida law, "[o]ne's business, aside from the investment of money and tangible property therein, is in every sense of the word property, and, as such, if lawful, entitled to protection from all unlawful interference." *NAACP v. Webb's City, Inc.*, 152 So.2d 179, 182 (Fla.Dist.Ct.App. 1963), *vacated as moot*, 376 U.S. 190, 84 S.Ct. 635, 11 L.Ed.2d 602 (1964). Hence, since one's business is property under Florida law, it cannot be injured or destroyed by the state without due process of law. *See Paramount Enterprises, Inc. v. Mitchell*, 104 Fla. 407, 140 So. 328 (1932). Thus, for example, in eminent domain proceedings, the loss of goodwill is compensable. *See, e. g., Matthews v. Division of Administration, State of Florida, Department of Transportation*, 324 So.2d 664 (Fla.Dist.Ct.App.1975). In addition, the State of Florida provides means of redress for private interference with goodwill. For instance, the purchaser of the goodwill of a business may recover compensatory damages from a seller who

---

**19.** In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court held that the "principle of compensation" governs damage awards under § 1983 since the basic purpose of the statute is "to compensate persons for injuries caused by the deprivation of constitutional rights." *Id.* at 1047. In applying that principle, the Court instructed, courts should be guided by the elements of damages allowable in comparable common law tort actions. *See id.* at 1049. However, the Court also admonished that the damage award in a § 1983 action must be tailored to the particular civil rights violation in question. *See id.* at 1049–50. We note that in the common law tort action for false imprisonment, injury to reputation is compensable as an element of damages. *See, e. g., Gibson Discount Center, Inc. v. Cruz*, 562 S.W.2d 511 (Tex.Civ.

App.1978); W. Prosser, Law of Torts 43 (4th ed. 1971). Since the fourth amendment protects some of our most cherished rights, and the injury to reputation flowing from the violation of those rights may be devastating, we have no doubt that a principle of fair compensation requires that injury to reputation caused by a violation of fourth amendment rights be compensable.

**20.** Although the Constitution of the State of Florida provides that "Every person may speak, write and publish his sentiments on all subjects but shall be responsible for the abuse of that right," Fla.Stat.Ann.Const. Art. 1, § 4 (West 1970), we have located no cases construing this provision as creating a liberty or property interest in reputation.

destroys the value of the goodwill. *See, e. g., West Shore Restaurant Corp. v. Turk,* 101 So.2d 123 (Fla.1958); *Yoo Hoo of Florida v. Catroneo,* 175 So.2d 220 (Fla.Dist.Ct. App.), *cert. denied,* 179 So.2d 212 (Fla.1965). Also a plaintiff may recover actual damages caused by a defendant's disparaging comments about the plaintiff's business which are of a kind calculated to prevent others from dealing with the plaintiff. *See, e. g., Continental Development Corp. of Florida v. Duval Title & Abstract Co.,* 356 So.2d 925 (Fla.Dist.Ct.App.1978); *Kilgore Ace Hardware, Inc. v. Newsome,* 352 So.2d 918 (Fla.Dist.Ct.App.1977).

▮ It thus appears that Florida does extend to appellants a "legal guarantee of present enjoyment" of goodwill, *i. e.,* the value inhering in the favorable consideration of customers arising from a business' reputation as being well established and well conducted. Since that interest is a protected property interest under Florida law, Florida may not deprive appellants of that interest without due process of law. Just as a state may not physically destroy a person's tangible property without complying with the requirements of the fourteenth amendment, so it may not destroy through the medium of speech a person's intangible property without the same compliance. Hence, to the extent the defamatory statements injured appellants' goodwill without due process of law, appellants have stated a claim upon which relief can be granted.[21]

#### c. *Injury to reputation "plus" loss of goodwill*

*Paul* instructs us that a liberty interest will be implicated if the defamation, in addition to injuring reputation, causes the loss of either a protected right or some "more tangible" interest. *See* pp. 512–513 & n.17, *supra.* The Court explained, for example, that in *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the defamatory posting of the plaintiff's name caused the denial of his state-created right to buy liquor. *See Paul, supra,* 424 U.S. at 708–09, 96 S.Ct. at 1164. Similarly, in *United States v. Lovett,* 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1945), the Court explained, the congressional labelling of plaintiffs as subversives resulted in their being barred from government employment. *See Paul, supra,* 424 U.S. at 702, 96 S.Ct. at 1161. Unlike these plaintiffs, the Court observed, Davis could not point to the denial of any protected, or at least more tangible, interest flowing from the defamation. *See id.* at 701, 711–12, 96 S.Ct. at 1160, 1165–66. Davis did not lose his job as a result of the defamation, and he could only allege that the defendants had deprived him of future employment opportunities. Had Davis been able to show that the defamation would, with some degree of certainty, lead to the loss of a protected or tangible interest, such as employment, a cognizable claim for denial of liberty would have been stated.

Appellants' claim of injury to their personal and business reputations under the circumstances alleged in their complaint is markedly different from Davis' claim. The *Paul* Court apparently reasoned that defamation that results in injury to personal reputation, *i. e.,* the way in which one is viewed in the community at large, does not necessarily cause injury to the person's protected, or at least more tangible, interests. Hence, before a liberty interest can be implicated, there must be a showing that the defamation resulted in injury not only to reputation but also to some other interest. Only then does the "extent of harm worked by that act," *id.* at 709, 96 S.Ct. at 1164, reach such a level of seriousness that a liberty interest is implicated and the requirements of due process are invoked.

▮ Here, at least some of the defamatory statements are alleged to have resulted in injury not only to appellants'

---

**21.** It may more often be the case that where a business is incorporated, only the corporation, rather than its shareholders, may recover for injury to goodwill. However, since appellants' business is a family-operated business of which appellants are the sole shareholders and officers, it is appropriate in this context that they be able to recover for the loss of goodwill just as if the business were not incorporated.

personal and business reputations,[22] but also to the goodwill of appellants' business, which, as we have determined, is a protected property interest. For instance, appellants have alleged that state and local officers falsely stated over local television that practically the entire inventory of appellants' store consisted of stolen property, and, by implication, that appellants dealt in stolen goods. To the extent this, or any other of the allegedly defamatory statements made by Rashkind or the police, resulted in injury both to appellants' personal and/or business reputations and to their goodwill, the stigma-plus requirement of *Paul* has been satisfied: the defamation caused both injury to reputation and damage to a protected or more tangible inter-

est.[23] The reputational interests at stake here are the interests an individual has in being free to move about, live, and engage in his livelihood without the burden of an unjustified label of infamy. When the government impairs those interests by leveling defamatory charges of a kind which also inescapably harm an individual's protected business interests, the reputational interests rise to the level of liberty interests and the fourteenth amendment demands no less than full compliance with due process of the law.

### d. *Injury to reputation "plus" violation of fourth amendment rights*

In *Paul*, Davis' suit was one which the Supreme Court described as a "classical

**22.** Here we are using "business reputation" in the sense of "the way in which one is viewed in the business community," as opposed to goodwill, or the value inhering in the way in which one's business is viewed in the community. It can be argued that injury to business reputation alone is sufficiently tangible to satisfy the requirements of *Paul*. *Paul* suggests that personal reputation is not a liberty interest because, standing alone, it is not sufficiently tangible. However, when defamatory statements directly disparage a person in his business capacity, arguably the protected or tangible "plus" of the stigma-plus requirement of *Paul* is inescapably present, for unlike injury to personal reputation, which may or may not carry with it adverse consequences to either protected or more tangible interests, injury to business reputation, if it occurs at all, necessarily results in harm to business interests that are either protected or at least more tangible. Because we conclude on several other grounds that appellants have stated a claim for injury to their business reputations, we do not reach the merits of this alternative theory.

**23.** The fact that the injury to the "plus" here, *i. e.*, to appellants' protected interest in goodwill, depends upon the reactions of third parties to the defamatory statements made by the government is immaterial. Although the state action in the cases discussed in *Paul* all involved instances in which the government itself directly deprived the individual of a protected, or more tangible interest, such as tax exemption status or government employment, state action is no less present here. Indeed, by acknowledging in *Paul* that defamation alone would be actionable under § 1983 if the State recognized reputation as a liberty or property interest, *see Paul, supra*, 424 U.S. at 711, 96 S.Ct. at 1165, the Supreme Court implicitly rejected any notion that state action is not the

cause of the injury to reputation. It is, after all, an elementary principle of our jurisprudence that a person is presumed to intend, and hence is held accountable for, the natural and probable consequences of his acts. Thus, for example, the Supreme Court has held that state exposure of some group affiliations abridges freedom of association even though the damage resulting from that disclosure will be imposed by private parties. *See, e. g., Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). As the Court stated in *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), a case involving an attempt by the Alabama Attorney General to compel the NAACP to disclose its membership roles:

> It is not sufficient to answer, as the State does here, that whatever repressive effect compulsory disclosure of names of petitioner's members may have upon participation by Alabama citizens in petitioner's activities follows not from *state* action but from *private* community pressures. The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power represented by the production order that private action takes hold.

*Id.* at 463, 78 S.Ct. at 1172; *see Shelton v. Tucker, supra*, 364 U.S. at 486–87, 81 S.Ct. at 251–52 (1960); *The Supreme Court, 1975 Term*, 90 Harv.L.Rev. 56, 95 (1976). Where, as alleged here, the State makes slanderous statements about a private citizen's business which will impair the citizen's ability to carry on his protected business, the adverse consequences of such statements are so readily foreseeable and certain that it would stand the basic principle of common law liability on its head to hold that state action did not cause those consequences.

claim for defamation." *Paul, supra,* 424 U.S. at 697, 96 S.Ct. at 1158. Davis did not challenge the validity of his initial arrest or the probable cause to support it. Hence, the defamation stood "alone and apart from any other governmental action with respect to him." *Id.* at 694, 96 S.Ct. at 1157. It was this claim, standing alone, which the Supreme Court held was not actionable under § 1983.[24]

Unlike the libel in *Paul,* the defamation here does not stand alone. Rather, accepting appellants' allegations as true, the defamation was intimately connected with the unlawful arrest of appellants and the unlawful search and seizure of practically the entire inventory of their store. Hence, the issue is whether the nexus between the defamation and the unlawful conduct is sufficient to satisfy the stigma-plus test of *Paul* so that appellants' personal and business reputations rise to the level of protected liberty interests.

*Paul* can be read to hold that no protected liberty interest is infringed unless the defamatory statements *cause* a loss of an interest more tangible than reputation. *See Paul, supra,* 424 U.S. at 708–09, 96 S.Ct. at 1164; pp. 515–516, *supra.* Other language in the opinion, however, indicates that a causal relationship is not necessary. For example, in explaining its decision in *Roth,* the Court stated:

> While *Roth* recognized that governmental action defaming an individual *in the course of* declining to rehire him could entitle the person to notice and an opportunity to be heard as to the defamation, its language is quite inconsistent with any notion that a defamation perpetrated by a government official but *unconnected* with any refusal to rehire would be actionable under the Fourteenth Amendment.

*Id.* at 709, 96 S.Ct. at 1164 (emphasis added). Hence, if there had occurred a defamation "in the course of the termination of employment," *id.* at 710, 96 S.Ct. at 1165, a liberty interest in reputation would have been implicated.

Relying on this analysis of *Roth* by the Supreme Court in *Paul,* this circuit has held that "stigma to reputation in conjunction with a failure to rehire" states a claim under § 1983 even though the defamatory statements did not *cause* the refusal to rehire. *See Dennis v. S & S Consolidated Rural High School District,* 577 F.2d 338, 342 (5th Cir. 1978). In *Dennis,* the school board voted not to renew Dennis' teaching contract. One month *later,* in response to the teacher's request, the board met to discuss the reasons for the non-renewal. Although the only reason given by the board as a body was that the action was in "the best interest of the school," several individual board members stated that they voted not to renew Dennis' contract because he had "neglected his duties" and was "inefficient." Two members also asserted that Dennis had "a drinking problem." *See id.* at 339.

We held that Dennis had been deprived of liberty without due process of law when members of the school board, in explaining why his teaching contract had not been renewed, publicly stated that he had a drinking problem. *See id.* at 341. We reasoned that "when the government employs an individual, it may not terminate the relationship in a manner which 'might seriously damage his standing and associations in his community' or foreclose 'his freedom to take advantage of other employment opportunities' without affording him 'a due process hearing at which he can make a fair fight to clear his name.'" *Id.* at 342–43. Since the allegation that Dennis had a drinking problem was "likely to blacken his

---

**24.** In *Paul,* the Court assumed that Davis' defamation claim would be "actionable in the courts of virtually every state." *Id.* at 697, 96 S.Ct. at 1159. Appellants here probably do not have a state forum in which to challenge the allegedly unlawful conduct of appellees since under Florida law, "statements made by officials of all branches of government in connection with their official duties [are] absolutely privileged." *Roberts v. Lenfestey,* 264 So.2d 449, 451 (Fla.Dist.Ct.App.1972), *quoting Hauser v. Urchisin,* 231 So.2d 6, 8 (Fla.1970); *see McNayr v. Kelly,* 184 So.2d 428 (Fla.1966).

name" in the community, *id.* at 343, we held that Dennis was entitled to the procedural protections of the fourteenth amendment.

Hence, in *Dennis,* we concluded that even though the defamation occurred *after* the decision not to rehire and thus did not *cause* the termination, the relationship between the stigma to Dennis' reputation in the community and the termination nevertheless was sufficient to satisfy the stigmaplus requirement *Paul. Cf. Colaizzi v. Walker,* 542 F.2d 969 (7th Cir. 1976), *cert. denied,* 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977) (similar holding in context of governor's discharge of employees and simultaneous issuance of press releases stating the reasons for discharge).

Our reading of *Paul* that the defamation need not cause the deprivation of another interest in order for a liberty interest to be implicated was recently confirmed by the Supreme Court in *Owen v. City of Independence,* —— U.S. ——, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). In that case, petitioner, the chief of police of the City of Independence, Missouri, became embroiled in a dispute with the city manager and the city council over his administration of the police department. At a city council meeting, the council voted to release an investigative report that allegedly impugned his character, and one councilman made allegedly defamatory statements about the petitioner. The next day, petitioner was fired by the city manager without any reasons being given for his dismissal. In petitioner's suit against the City, the city manager, and the members of the council in their official capacities, for alleged violations of his constitutional rights to procedural and substantive due process, the district court held, *inter alia,* that petitioner had not been deprived of any liberty interest by the city council because the council's actions had no causal connection to petitioner's discharge. This holding rested on the district court's finding that, prior to the city council meeting, the city manager had decided to discharge petitioner and had even found a replacement. *See Owen v. City of Independence,* 421 F.Supp. 1110, 1121 (W.D.Mo. 1976), *reversed,* 560 F.2d 925 (8th Cir. 1977),

*vacated and remanded on other grounds,* 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978).

Although the eighth circuit did not dispute the district court findings, it nevertheless concluded that appellant was deprived of liberty without due process. *See Owen v. City of Independence,* 560 F.2d 925, 937 (8th Cir. 1977), *vacated and remanded on other grounds,* 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978). The fact that the defamatory charges did not cause petitioner's dismissal was, in the court's view, immaterial. It was sufficient that "the official actions of the city council released charges against [him] contemporaneous and, in the eyes of the public, connected with that discharge." *Id.* at 937. When the issue finally reached the Supreme Court on appeal of the remanded case, *Owen v. City of Independence,* 589 F.2d 335 (8th Cir. 1978), *reversed on other grounds,* —— U.S. ——, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the Supreme Court agreed with the circuit court:

*Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971), held that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." In *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972), we explained that the dismissal of a government employee accompanied by a "charge against him that might seriously damage his standing and associations in his community" would qualify as something "the government is doing to him," so as to trigger the due process right to a hearing at which the employee could refute the charges and publicly clear his name. In the present case, the city—through the unanimous resolution of the City Council—released to the public an allegedly false statement impugning petitioner's honesty and integrity. Petitioner was discharged the next day. The Council's accusations received extensive coverage in the press, and even if they did not in

point of fact "cause" petitioner's discharge, the defamatory and stigmatizing charges certainly "occur[red] in the course of the termination of employment." Cf. *Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976). Yet the city twice refused petitioner's request that he be given written specification of the charges against him and an opportunity to clear his name. Under the circumstances, we have no doubt that the Court of Appeals correctly concluded that the city's actions deprived petitioner of liberty without due process of law.

*Owen v. City of Independence,* —— U.S. ——, —— n.13, 100 S.Ct. 1398, 1406 n.13, 63 L.Ed.2d 673 (1980).

■ Hence, it is now apparent that the defamatory communication need not *cause* the loss of the protected right, or more tangible interest, in order to satisfy the stigma-plus requirement of *Paul.* Instead, it is sufficient that the defamation occur in connection with, and be reasonably related to, the alteration of the right or interest. Here we face a similar connection between the "stigma" and the "plus" but in the context of the state's deprivation of an individual's fourth amendment rights rather than the state's alteration of a state-created right or interest. In *Owen,* the defamation did not cause the employee's discharge; instead, the fact that the public perceived the defamatory charges to be connected to the discharge was sufficient to give rise to a liberty interest. Similarly, here the defamation did not cause the violation of appellants' fourth amendment rights; however, the public surely perceived the defamatory statements made by the police and Rashkind to be connected to the arrests and search and seizure. In *Dennis,* the defamation did not cause the refusal to rehire; rather, unpublicized reasons were

the basis for the decision not to renew Dennis' contract and the defamation arose only when those reasons were subsequently made public. Similarly, here the defamation did not cause the unlawful arrests and search and seizure; rather, unpublicized reasons of Rashkind and the police led to the arrests and search and seizure, and the defamation occurred when those reasons were subsequently publicly aired.[25]

■ We can discern no rational reason why reputation should be accorded any less protection when the injury to reputation is inflicted in connection with the denial of a right specifically secured by the Bill of Rights than when the injury occurs in connection with the denial of a state-created right or interest such as employment. Just as the state, as employer, may not create and disseminate a false and defamatory impression about an employee in connection with his termination, so the state, in enforcing its laws, may not issue false and defamatory statements about a citizen in connection with an unlawful arrest or search and seizure without complying with due process. Since the defamation alleged here occurred in connection with the alleged violation of appellants' fourth amendment rights, the injury to appellants' personal and business reputations constitutes the deprivation of liberty interests.

### 3. *Due Process*

■ In order to state a claim under the fourteenth amendment, the complainant must allege facts showing not only that the State has deprived him of a liberty or property interest but also that the State has done so without due process of law.[26] Having determined that the injury to appellants' personal and business reputations constitutes the deprivation of liberty and/or

---

**25.** We reiterate that we are discussing only *false, defamatory* statements allegedly made by persons acting under color of state law. A statement that "*X* has been arrested for receipt of stolen property" would not be defamatory if *X* in fact had been arrested for the reason stated since such a statement merely states a fact. However, a statement that "*X* has re-

ceived stolen property" would be defamatory if in fact the property *X* received was not stolen.

**26.** To the extent injury to appellants' personal and business reputations was caused by the illegal search and seizure, *see* pp. 513–514, *supra,* no separate due process question arises.

**520**

property interests by the State, we now address this final requirement. Since, on the basis of the facts alleged, the lack of due process is evident, we process this last requirement without much ado.

With respect to the fourteenth amendment grounds upon which injury to appellants' personal and business reputations constitutes deprivation of liberty or property interests, appellants were not accorded even the minimal elements of due process. The rudimentary elements of due process are notice and the opportunity to be heard. *See, e. g., Goldberg v. Kelly,* 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1969). Hence, " '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' " *Owen v. City of Independence,* —— U.S. ——, —— n.13, 100 S.Ct. 1398, 1406 n.13, 63 L.Ed.2d 673 (1980), *quoting Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971); *see Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168–70, 71 S.Ct. 624, 646–48, 95 L.Ed. 817 (1950) (Frankfurter, J., concurring); *United States v. Lovett,* 328 U.S. 303, 316–17, 66 S.Ct. 1073, 1079–80, 90 L.Ed. 1252 (1945). Although the time and manner in which procedural safeguards must be invoked varies with "the precise nature of the government function involved as well as of the private interest that has been affected by governmental action," *Cafeteria and Restaurant Workers Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–1749, 6 L.Ed.2d 1230 (1961), here we need not undertake a detailed inquiry into what process is due since, on the basis of the facts alleged, appellants were not afforded even the bare elements of due process at any time and thus certainly have stated a claim upon which relief can be granted.

### III. *Conclusion*

For the reasons stated, the district court's dismissal of appellants' suit for failure to state a claim upon which relief can be granted is reversed except as to Defendant Reno, and the case is remanded to the district court with instructions to grant leave to appellants to amend their complaint and for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**