Hardy W. **RYLAND** and Alma Odessa Ryland

v.

Alfred B. **SHAPIRO, et al.**

Civ. A. No. 81–1709.

United States District Court, W.D. Louisiana, Lafayette-Opelousas Division.

May 25, 1984.

As Amended Aug. 15, 1984.

Dennis R. Whalen, Baton Rouge, La., Glynn W. Reynolds, Alexandria, La., for plaintiffs.

John F. Simon, Alexandria, La., for defendants.

## OPINION

SHAW, District Judge.

In this suit, Hardy and Alma Odessa Ryland seek recovery under the Civil Rights Act of 1871, 42 U.S.C. § 1983, from Edwin Ware and Edward Roberts. The Rylands claim that the defendants, in the course of their duties as District Attorney and Assistant District Attorney of Rapides Parish, deprived them of their civil rights by wrongfully interfering with their access to the state courts in order to bring a wrongful death claim. Such a claim is now pending in state court against a former Assistant District Attorney, Al Shapiro, and it is alleged therein that Shapiro shot and killed the Rylands' daughter, Lavonna Ryland. The Rylands claim that District Attorney Ware and Assistant District At-

torney Roberts impaired their access to state court by preventing a full investigation into the cause of Lavonna's death and by covering up the alleged murder by Shapiro. The Rylands allege that Ware and Roberts accomplished. this coverup by: (1) cancelling an autopsy previously scheduled by the local coroner, (2) persuading the coroner to sign a Coroner's Report and Death Certificate listing the death as a suicide even though the Coroner never examined the body, and (3) delaying a police investigation by representing to the police that Lavonna's death was a suicide. The matter came on before this Court, without a jury, on April 25, 1984. This narrative opinion will serve as the Findings of Fact and Conclusions of Law required by Federal Rule of Civil Procedure 52(a).

### Findings of Fact

During the early morning of November 25, 1979, Roberts received a telephone call at his home from the Alexandria City Police notifying him that Lavonna Ryland, plaintiffs' daughter, had been shot at approximately 2:30 a.m. at the home of Al Shapiro, a former assistant district attorney. It was standard procedure for the police to call an assistant district attorney to the scene of a homicide investigation for any assistance or legal advice the police might need.

Roberts arrived at the scene shortly thereafter and was advised by the police that Shapiro had stated that Lavonna had shot or killed herself. Shapiro repeated this to Roberts. Roberts told the police to obtain a statement from Shapiro and to conduct atomic absorption tests on the hands of Shapiro and Ryland. These tests indicate whether someone has been in contact with a weapon that has been fired. The test was performed on Shapiro at his residence by Sgt. Urena of the city police. By this time Lavonna, who was still alive, had been removed to the hospital by the medics. Sgt. Urena completed his investigation at the scene and then proceeded to the hospital to perform the atomic absorption test on Lavonna. Before leaving the Shapiro home, Sgt. Urena took photographs and secured custody of the weapon.

Roberts arrived at the hospital about the same time as Sgt. Urena, ordered a drug screen and blood alcohol test on Lavonna, had a brief conversation with the Rylands and then returned to his home to sleep. Roberts was told on the night of the shooting that Lavonna had attempted to take a large quantity of valium at a hospital shortly before going to Shapiro's home. Roberts was also aware of a reported attempted suicide on a prior occasion.

### The Autopsy

At approximately 9:30 p.m. on November 25, Roberts received a phone call from Dr. John Patton, a neurosurgeon who had attended Lavonna at the hospital emergency room. Dr. Patton advised that he felt Lavonna would die soon, and was calling to see if harvesting of the kidneys for donation would interfere with an autopsy. At this point, the Ryland family wanted an autopsy to be performed. Roberts and Patton decided that a kidney retrieval could be performed regardless of whether an autopsy was done. The two men then discussed the merits of taking an autopsy in light of the other test results available. Patton stated that he had observed powder burns below her right eye and had ordered a CAT scan x-ray that would determine the path of the bullet and was of the opinion that an autopsy would not reveal any additional information about the cause of death. The Court interprets this testimony to mean that an autopsy would only confirm the cause of death, a gunshot, and would not be of any additional aid in determining whether the death was a suicide, a homicide or accidental. Roberts asked Patton to explain to the family what an autopsy would show and what it would do to the girl's body.

Patton called back shortly thereafter to inform Roberts that the Rylands had decided not to have an autopsy performed. Roberts indicated that he also did not feel that an autopsy was necessary and that he would not require that one be performed. Lavonna died a few hours later, at approxi-

mately 11:45 p.m. on November 25, while on the way to the operating room.

Mrs. Ryland contradicts Dr. Patton's testimony that she and her husband agreed that an autopsy would not be conducted, but the Court feels that it must accept Dr. Patton's version of what transpired at the hospital as he was an impartial witness with no apparent interest in the outcome of this case. This discrepancy could also be explained by the fact that plaintiffs must have been under severe emotional strain at that time which could have impaired their recollection of the conversation.

Mrs. Bobbie Goleman, office manager and medical secretary to Dr. Walter Cloud, the assistant coroner who was out of town, also received a call on November 25 from the city police reporting the shooting. It was a common practice for her to make "coroner's calls" if Dr. Cloud was unavailable and handle the necessary paper work at the scene, and in cases of suspicious or violent deaths, arrange for the body to be taken to one of the pathologists for an autopsy. Mrs. Goleman went to the hospital emergency room and learned that Lavonna was still alive so she left. She was later informed on November 26 that Lavonna had died and ordered that the body be held at the morgue for an autopsy by the pathologist. At this point she was not aware of the decision by Dr. Patton, the plaintiffs and Roberts not to conduct an autopsy, and Roberts did not know that Mrs. Goleman had asked for an autopsy.

Ware was officially notified that Lavonna had been shot when he received a telephone call from Roberts during the late morning of November 25. When Ware arrived at his office on the following Monday, November 26, he and his staff decided that the Louisiana Attorney General's Office should be brought into the case because the incident involved Shapiro, a former assistant district attorney who had served under Ware and worked with Roberts until August of 1976. Roberts informed Ware that there was to be no autopsy. Ware was not convinced that Lavonna's death was a suicide and stated that the bullet should be retrieved.

Roberts immediately called Dr. James Hair, a pathologist and consultant to the coronor, and requested that the fatal bullet be retained. At that time Dr. Hair stated that the path of the bullet could be determined from the CATscan x-ray, that the powder burns indicated that the weapon was fired at close range and that an autopsy would not shed any additional light on the matter. Roberts agreed and Dr. Hair obtained the bullet which was just under the skin and gave it to Sgt. Urena. Dr. Hair did not mention to Roberts that Mrs. Goleman had requested an autopsy, but Hair had in fact been about to call Roberts on that subject. Dr. Hair would not perform an autopsy on an order from a doctor's secretary, and had wanted clarification from the D.A.'s office as to what to do. Dr. Hair testified that he would have performed the autopsy if the Coroner had ordered one or if the family had paid for one regardless of the wishes of the D.A.'s office.

Mrs. Goleman's records reveal that on December 7, 1979 she was informed at 1:30 p.m. by "Nancy" at the Rapides General Hospital Lab that Ed Roberts had "cancelled" her "order" for an autopsy and requested that only the bullet should be removed. This notation was properly objected to on the ground of hearsay and will not be considered by the Court and even if it would be accepted, it could certainly be explained by Dr. Hair's refusal to conduct an autopsy on orders from a secretary and the joint decision by Dr. Patton, the Rylands and Roberts to dispense with an autopsy.

The examination and tests performed by the physician, in addition to the information secured by the investigation, produced all of the information that would have been disclosed by an autopsy performed locally. A forensic pathologist may have uncovered more detail, but the state of the art in connection with autopsies at that time in Rapides Parish had not reached such refinement.

Later, the F.B.I. and the U.S. Attorney began an investigation into the Ryland

shooting. They contacted Dr. George McCormick, II, a forensic pathologist, who performed an autopsy on February 25, 1980 after the body was disinterred. He determined that the cause of death resulted from a gunshot wound of the right cheek. He concluded that the gunshot wound was not self-inflicted based on the fact that (1) the muzzle of the gun was two to six inches from the skin which in his experience is not the position a gun is held by a person attempting suicide (2) it is not common for a young attractive female to commit suicide by shooting herself in the face (3) a reinactment of the shooting (4) the inconsistent statements from Shapiro, and (5) drug testing that would indicate that Ryland was not intoxicated. He felt that an autopsy should have been performed. Yet, it is clear that Dr. McCormick's conclusion that Lavonna Ryland did not commit suicide is based almost exclusively on information that either was or could have been available without an autopsy. Blood samples for drug and alcohol tests were taken while Lavonna Ryland was still living. At the time that an autopsy was being discussed, no one could have foreseen that Sgt. Urena would lose track of the samples. McCormick's autopsy refined the estimate of the firing distance from "close range" (based on the powder flecks in the skin) to two to six inches. While this may be an uncommon range for suicide, it certainly does not rule out suicide any more effectively than did the "close range" estimate. If, on the other hand, an autopsy would have revealed that Lavonna was shot from a distance exceeding her arm's length, then the autopsy results would have been quite significant. The other facts upon which McCormick relies were clearly not dependent solely upon an autopsy. Therefore, the Court finds that an autopsy, even one performed by Dr. McCormick on the date of Lavonna Ryland's death, would not have revealed any additional information of significance in determining whether the death was a suicide, a homicide, or accidental.

Dr. Charles S. Petty, a forensic pathologist and the chief medical examiner of Dallas County, testified on behalf of the defendant. He was of the opinion after reviewing all the available evidence including the findings of Dr. McCormick that there was not enough evidence to reveal whether Ryland's death was an accident, homicide or suicide.

### The Death Certificate

Ware had a telephone conversation and thereafter a meeting with Dr. Wallace Reynolds, an associate of Dr. Cloud, at his office to discuss his authority to handle the functions of the coronor's office in the absence of the coronor or the assistant coronor. The coronor, Dr. Ronald Tischler, was out of town on November 25, 1979 and could not be found at his office in Alexandria until on or about January 16, 1980. Dr. Cloud was tied up out of town with a broken leg. Present at this meeting were Ware, Roberts, Dr. Reynolds and Mrs. Goleman. Dr. Reynolds testified that at this meeting Ware urged him to sign the death certificate certifying the Ryland case as a suicide which is flatly denied by Ware, Roberts and Mrs. Goleman. Mrs. Goleman testified that there was no conversation among them concerning the Ryland death certificate although Dr. Reynolds kept trying to bring up the subject. In her words the conversation centered around the appointment or functions of Dr. Reynolds as acting coroner. According to Mrs. Goleman, Roberts did not say one word during the entire conversation which was mainly between Ware and Dr. Reynolds. The only time Mrs. Goleman ever talked with Roberts was on one occasion when he called and asked why she wanted a copy of his order to cancel the autopsy.

There is sufficient evidence in the record to indicate that Dr. Reynolds' testimony is entitled to little weight. There are several indications of a strong bias by Reynolds against both Ware and Roberts. Ware was instrumental in having Coroner Tischler fire Reynolds and appoint Dr. Sherman as Chief Deputy Coroner before Tischler resigned from his post. Tischler had purportedly resigned earlier, but had failed to follow the applicable statute. After the apparent resignation, Reynolds had sought

to act as Acting Coroner on the basis of his prior appointment as Chief Deputy, which may have been procured through a fraudulent artifice. On Ware's urging, Tischler fired Reynolds, appointed Sherman, and then resigned legally. Reynolds then sued Sherman to enjoin him from acting as Coroner. Ware represented Sherman in the suit. Ware then actively supported Sherman against Reynolds in the next election and then supported Reynolds' opponent in the succeeding election. Ware is currently a likely witness for the State in a malfeasance prosecution against Reynolds. The Attorney General's office is prosecuting the case because of Ware's recusal on the ground of his being a witness. Reynolds actively supported Roberts' opponent in Roberts' race for district judge. Finally, it was Reynolds who, in the midst of this campaign, suggested that the Rylands sue Roberts and Ware and referred them to his brother, who served as co-counsel for the plaintiffs in this matter. Contracted with the testimony of this heavily biased witness is the testimony of Mrs. Goleman, Dr. Cloud's secretary. This witness who apparently has no bias or interest in the outcome of this trial, contradicted Reynolds' testimony on every material point.

When Dr. Tischler was finally located on January 16, 1980, Sgt. Humphries of the city police, on orders from Alexandria Chief of Police Ezernak picked up the death certificate at Dr. Tischler's office and took it to the doctor's home where it was signed. At no time did Dr. Tischler speak to Ware or Roberts from the date of Lavonna's death on November 25, 1979 until January 16, 1980 when he signed the death certificate. Dr. Tischler did speak with Chief Ezernak who stated that the death was an apparent suicide which the Court cannot say was an unreasonable conclusion prior to the date the results of the atomic absorption tests were made available. The record is also clear that neither Ware nor Roberts had any contact with Dr. Tischler's secretary, Bobbie Goodwin, during his absence.

*The Delayed Investigation*

The Rapides Parish District Attorney's office does not conduct criminal investigations. The district attorney relies upon the Alexandria City Police for investigation of crimes within that city and, after receiving the completed investigation report, decides whether or not to prosecute. The Alexandria Police Department was in fact responsible for the investigation of the Lavonna Ryland shooting and had been conducting that investigation from the moment that Shapiro reported the incident. Yet the investigation was not completed and a report was not forwarded for consideration until after the Louisiana State Attorney General had taken over the case. Officially, however, the D.A.'s office was never out of the Ryland case. Within a few days of the shooting, the case was assigned to Greg Fowler, another assistant district attorney. Roberts was never assigned to handle the Ryland case. Roberts had no involvement with the investigation or prosecution of the case after his conversation with Dr. Hair about retrieving the bullet. Ware did make at least one inquiry of the Chief of Police concerning the progress of the investigation. The two men had no other connection with the investigation.

There was a delay in the investigation sufficient to arouse suspicion in the beginning but the evidence at the trial convinces the Court that the delay was occasioned by an innocent mistake on the part of Sgt. Urena, the investigating officer on the case. The kit containing the swabs of the atomic absorption test was placed in the evidence locker at the city police department and Sgt. Urena simply forgot that he had not sent that item to the laboratory. Consequently, everyone sat around waiting for the results. The F.B.I. entered the case at the request of the plaintiffs around February 13, 1980, and the mistake was discovered. The samples were then sent to the laboratory, and the results were reported shortly thereafter. The results indicated that Shapiro had handled the weapon and/or touched the body, contradicting Shapiro's original statement to the Alexandria City Police.

The evidence does not indicate that Ware and Roberts were motivated by a desire to cover up for their former colleague. In fact, the evidence reveals that prior to the death of Lavonna Ryland, Roberts, with Ware's knowledge and consent, had forwarded information concerning Shapiro's possible involvement with drugs to the Alexandria City Police narcotics division for appropriate action.

### Knowledge of the Plaintiffs

Nearly all of the information that might point to a coverup was known to the Rylands no later than the early part of March 1980. Alma Ryland had learned from the U.S. Attorney that the results of the atomic absorption test had not been forwarded to the lab, contrary to what Chief Ezernak had been telling her previously, apparently in ignorance of Sgt. Urena's error. Alma Ryland had been to see Bobbie Smith, Dr. Tischler's secretary. There, she obtained a copy of the report of death, which indicated that Dr. Tischler had reported the death as a suicide even though he did not himself examine the body. She also obtained a copy of Bobbie Goleman's note, which stated that Roberts had cancelled the autopsy. Evidence pointing to a murder was also known to the Rylands by early March 1980. The atomic absorption tests were known to them and Dr. McCormick had conducted his autopsy. Mrs. Ryland testified that she did not know the "fact" that Lavonna Ryland's hands had not been washed prior to the atomic absorption test until the trial of Shapiro for murder. Mrs. Ryland could not state for certain, but believed that she spoke to Dr. Reynolds after rather than before the Shapiro trial. Suit was filed September 16, 1981.

### Conclusions of Law

 The plaintiffs' civil rights claims have prescribed. The applicable period of limitations is Louisiana's one-year prescription for tort actions. *E.g., Watts v. Graves,* 720 F.2d 1416, 1423 (5th Cir.1983). A section 1983 action accrues and the prescriptive period begins to run when the plaintiffs are in possession of the "critical facts" that they have been hurt and the identity of the persons who have inflicted the injury. *Id.* The Court concludes in this case that the Rylands were in possession of the "critical facts" no later than early March 1980, well over a year before the section 1983 action was filed.

Mrs. Ryland did testify that she did not know the fact that Lavonna Ryland's hands had not been washed until the trial of Shapiro for murder sometime after September 30, 1980.[1] Yet the critical facts for the section 1983 coverup claim and the Article 2315 wrongful death claim must be kept distinct. That is, the critical facts for the civil rights claim are those pointing to a coverup of the investigation by Ware and Roberts while the critical facts for the wrongful death claim are those pointing to a murder by Shapiro. The trial testimony alluded to by Mrs. Ryland had no bearing upon her knowledge of a coverup of the circumstances of Lavonna Ryland's death by the D.A.'s office. Rather, it merely served to confirm Mrs. Ryland's belief that Shapiro had murdered her daughter. The Rylands' claim is for wrongful interference with their right to bring a wrongful death action. They did not need to know the strength of their state tort claim, *i.e.,* the amount of evidence pointing to a murder, in order to have knowledge of wrongful

---

1. Actually, this "fact" has never been conclusively determined. *See State v. Shapiro,* 431 So.2d 372, 381, 386 & n. 10 (La.1982).

The Fifth Circuit directed this Court to consider the effect on this case of the Louisiana Supreme Court's reversal of Shapiro's conviction on rehearing. *Ryland v. Shapiro,* 708 F.2d 967, 969 n. 1 (5th Cir.1983). The Louisiana Supreme Court's opinion does not preclude any contrary resolution of an issue in this case because Louisiana does not recognize the "collateral estoppel" doctrine. *See Watts v. Graves,*

720 F.2d 1416, 1421 (5th Cir.1983). Civilian res judicata cannot be invoked here because the relief demanded in the two suits is entirely different and the parties to the two suits are not identical. *Id.* In short, the failure by the State to prove murder beyond a reasonable doubt has no impact on the Rylands' effort to prove a coverup of a possible murder by a preponderance of the evidence. In any event, neither party has invoked either one of these doctrines here.

interference with their right to bring the claim. The Rylands do not have to prove a murder to prove a coverup and therefore the testimony regarding the washing of the hands was not a "critical fact".

Mrs. Ryland may not have spoken to Dr. Reynolds about the alleged attempts to get him to sign the death certificate until less than a year before this action was filed. It is indeed difficult to determine when the plaintiffs had sufficient "critical facts" to know or have reason to know of the injury which is the basis of this action because the plaintiffs produced only scant evidence in support of the allegations in their complaint. The Court concludes, however, that sufficient "critical facts" were known to the Rylands to begin the running of prescription in March of 1980. Within a few months of the shooting, Mrs. Ryland had raised enough suspicious material—Bobbie Goleman's notes indicating that Roberts had cancelled the autopsy and apparent irregularities in the report of death—to go to the F.B.I. The F.B.I. and the U.S. Attorney came into the case at the urging of the plaintiffs and further informed them that the tests and exhibits had never been sent to the lab for analysis. Thus, the Rylands had reason to know of a possible coverup long before Mrs. Ryland spoke to Reynolds. Indeed, they had been suspicious enough to call in the F.B.I.

■ This case must be dismissed, however, for an even more fundamental reason. The plaintiffs failed to make out a case under section 1983. In a civil rights action such as this, the plaintiffs must prove two elements by a preponderance of the evidence. The plaintiffs must first prove that one or both of the defendants deprived them of a right secured by the Constitution or laws of the United States. They must then prove that the defendants deprived them of this right under color of state law. Here, the plaintiffs have failed to prove the first element. The defendants, Edwin Ware and Edward Roberts, did not interfere with the Rylands' access to the Louisiana courts for the purpose of bringing a wrongful death claim.

■ There is no evidence that Edwin Ware and Edward Roberts intentionally or negligently cancelled an autopsy previously scheduled to be performed by the Coroner. The Coroner never ordered an autopsy; his secretary's "order" was never valid. The decision not to conduct an autopsy was ultimately made by the Ryland family, albeit with the concurrence of Roberts, who would not himself require an autopsy to be performed if the family did not want one. The family could have had an autopsy performed regardless of the wishes of the D.A.'s office. In any event, the failure to perform an autopsy did not interfere with the Rylands' wrongful death action. An autopsy added little, if any, insight into the nature of the shooting.

There is absolutely no evidence that Ware or Roberts persuaded Coroner Tischler to list the death as a suicide on the Coroner's Report and Death Certificate without examining the body. Dr. Reynolds' testimony that the defendants attempted to persuade him to list the death as a suicide was not worthy of belief. Thus, the evidence does not show that Ware or Roberts attempted to influence *anyone* in this regard.

■ Similarly, there is absolutely no evidence that Ware or Roberts acted or failed to act in an attempt to delay the police investigation of the shooting. The delay is clearly traceable to Sgt. Urena's memory lapse. The defendants cannot be held accountable for the negligence of this police officer under section 1983. The Act does not impose vicarious liability but instead requires an affirmative link between the plaintiffs' injuries and the defendants' personal conduct. *Monell v. New York Department of Social Services*, 436 U.S. 658, 693, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode*, 423 U.S. 362, 371–72, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976); *Thompson v. Steele*, 709 F.2d 381 (5th Cir. 1983).

In their post-trial submission, the plaintiffs suggest that liability can be based on the mere fact that Ware or Roberts did not themselves investigate the shooting more

thoroughly and that they did not initiate a prosecution against Shapiro prior to the Attorney General's entry into the case. Consideration of this contention requires a fairly liberal reading of the complaint because the action stated therein seems to be based on specific overt acts to cover up a murder rather than the mere failure to uncover one. The Court will proceed to the merits of this contention however.

■ The Court concludes that the defendants are absolutely immune from a civil suit for damages under section 1983 based upon their mere failure to initiate a criminal prosecution with greater dispatch. In *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court recognized such an immunity from a section 1983 damages action for prosecutors engaged in initiating a prosecution and in presenting the State's case. *See also Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (absolute immunity for executive officials in administrative proceedings). The Court expressly reserved the question, however, of whether prosecutors enjoyed an absolute immunity from section 1983 damage actions involving a decision "of whether to present a case to a grand jury, whether to file an information, [or] whether and when to prosecute...." 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. Under controlling Fifth Circuit authority, these decisions will give rise to absolute immunity only if they are considered to be within the prosecutor's "quasi-judicial role". *Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981). The rationales supporting absolute immunity counsel its application to the prosecutor's decision of whether and when to prosecute.

Absolute prosecutorial immunity is founded upon the

> concern that harassment by unfounded litigation would cause [the prosecutor to] shade his decisions instead of exercising the independence of judgment required by his public trust.
> ....

> ... A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages.

*Imbler,* 424 U.S. at 424, 96 S.Ct. at 992. *See also* La.Code Crim.Pro. art. 61 (the article grants the D.A. full discretion in deciding whether and when to prosecute). Independence in making the decision *not* to prosecute, or to delay prosecution, is just as vital as is independence in making the decision to prosecute. A prosecutor must have the flexibility to marshal his resources in a manner that best serves his community. Unfortunately, it is probably impossible to prosecute all apparent crimes that come to the attention of the authorities. Thus, the District Attorney is charged with the responsibility of allocating the limited resources at his command in the manner that he feels best serves the public interest. His ability to discharge this duty could be severely compromised if some individuals could make their particular interests paramount to those of the community through the threat of a civil rights damage suit for failure to prosecute.

More significantly, perhaps, the prosecutor must be left free to balance the public interest in prosecution of criminal behavior against the potential defendant's interest in not being subjected to an unwarranted criminal prosecution. That a person has committed a particular crime is not always clear to even the most jaundiced eye. Private persons may desire, either out of malice or out of a genuine feeling of being wronged, that an individual be prosecuted even though the evidence against him is quite tenuous. Without absolute immunity, an individual could use the threat of civil liability to push the District Attorney to turn a questionable case into what turns out to be a wholly unwarranted prosecution. In this situation, the criminal defendant's civil liberties would be seriously injured. Absolute immunity would preclude

this misuse of section 1983 by insuring that the District Attorney's decision to prosecute remains free of biased influences.

Similarly, a prosecutor needs flexibility in deciding *when* to initiate prosecution. A central feature of the prosecutor's public trust is his responsibility for determining when an investigation has produced sufficient evidence to justify initiation of a prosecution. His ability to make this determination independently would be greatly impaired if he is subject to "second-guessing" in a civil damages action. Moreover, prosecutions are frequently delayed for significant strategic reasons even when sufficient evidence to prosecute and convict exists. Frequently, law enforcement officials delay prosecution of known criminals in order to thereby secure evidence for prosecuting others engaged in the same criminal activity. This significant technique for ferreting out large-scale criminal activity could fall into disuse if prosecutors feared civil liability for delaying a prosecution.

*Marrero* instructs that the "second reason justifying absolute immunities for prosecutors engaged in quasi-judicial activities is that 'the safeguards built into the judicial system tend to reduce the need for private damage actions as a means of controlling unconstitutional conduct'." 625 F.2d at 509, *quoting Butz*, 438 U.S. at 512, 98 S.Ct. at 2913. At least with regard to Louisiana, the judicial system does contain adequate safeguards against abuse of the district attorney's discretionary power not to prosecute. Under Articles 437 and 438 of the Louisiana Code of Criminal Procedure, the grand jury has the power, and, with regard to capital offenses, the duty, to investigate all offenses that fall within their jurisdiction even when the district attorney does not request that they do so. If the grand jury believes that a crime has been committed after this investigation, they have the power to initiate a prosecution by way of indictment under Article 443. *See Sheridan v. Garrison*, 273 F.Supp. 673, 677 (E.D.La.1967). The presence of this judicial safeguard further justifies a privilege of absolute immunity for the decision of whether and when to prosecute.

■ The Court therefore concludes that Edwin Ware and Edward Roberts are entitled to absolute immunity against a section 1983 damage claim based upon any delay in the prosecution of Al Shapiro for the alleged murder of Lavonna Ryland. Even if Ware and Roberts were entitled to only a qualified immunity under the standards referred to in *Marrero*, 625 F.2d at 510, that more limited immunity would surely be available to these defendants under *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). The defendants are entitled to qualified immunity in regard to their investigative function, *see Marrero*, 625 F.2d at 510–11, and the same conclusion as to the availability of the immunity applies here.

■ Neither Ware nor Roberts knew or reasonably should have known that their reliance upon the Alexandria City Police Department to conduct the investigation would contribute to an *effective* coverup of evidence indicating that a murder may have occurred. Past practice justified their relying on the police for the investigation. A prosecution without sufficient investigation would have been premature. Indeed, Ware took reasonable steps to move the investigation along by calling Chief Ezernak to check on progress. Everyone was simply waiting, in the midst of their other responsibilities, for a return of the results from the tests that then-Sgt. Urena had never actually sent. Thus, the defendants had no reason to know that their own inaction might contribute to a possible violation of the Rylands' constitutional rights.

Similarly, the defendants did not deliberately take a "hands off" approach with the malicious intention to deprive the Rylands of their constitutional rights. The delay in the investigation of the shooting of Lavonna Ryland and the prosecution of Al Shapiro was attributable solely to the poor memory of Sgt. Urena and the completely good faith reliance by everyone else upon Sgt. Urena's statements that he sent the materials to the lab for testing. There is absolutely no intimation in this record that the

defendants in any way abused their privilege to assert qualified immunity from suit.

As the plaintiffs have failed to substantiate any of the allegations of their complaint, their suit is hereby DISMISSED with prejudice at their costs.