

# THE ATTORNEY GENERAL
## OF TEXAS

June 22, 1988

JIM MATTOX
ATTORNEY GENERAL

Mr. Perry L. Adkisson
Chancellor
Texas A & M University System
319 System Building
College Station, Texas    77843

Opinion No. JM-920

Re:  Construction of Texas
Commercial Fertilizer Con-
trol Act, chapter 63 of
the Agriculture Code
(RQ-1240)

Dear Mr. Adkisson:

You ask two questions about the procedures to be
followed by the Director of the Texas Agriculture Experiment
Station in enforcing the Texas Commercial Fertilizer Control
Act, chapter 63 of the Agriculture Code. These are as
follows:

> 1.  Whether a fertilizer manufacturer has
> a legal right to notification of violative
> analytical findings by the Texas Feed and
> Fertilizer Control Service and to exhaustion
> of legal remedies prior to the service
> notifying purchasers of these findings; and

> 2.  Whether the Director of the Texas
> Agricultural Experiment Station is compelled
> to give equal weight to analytical findings
> of commercial laboratories when a manu-
> facturer contests the results of the state
> chemist.

Chapter 63 of the Agriculture Code provides for
regulation of the manufacture and distribution of commercial
fertilizer. Agric. Code §§ 63.031, 63.051, 63.091, 63.121;
see also Agric. Code §§ 63.001, 63.002 (defining "commercial
fertilizer" and other terms). The duties set out in chapter
63 of the Agriculture Code are the responsibility of the
Director of the Texas Agricultural Experiment Station, to be
performed by the Texas Feed and Fertilizer Control Service
under his direction. The Agriculture Code prohibits the
manufacture and distribution of commercial fertilizer
without a permit issued by the service and requires

containers of fertilizer to be labeled with certain information, including the grade of the fertilizer and the guaranteed analysis of plant nutrients in it. Agric. Code §§ 63.031, 63.051.

Subchapter G of chapter 63 provides remedies for violations of the chapter, including a stop-sale order, condemnation, warnings, and a suit to enjoin a violation or threatened violation. Agric. Code §§ 63.121, 63.122, 63.124. Subchapter H sets out criminal penalties for violation of chapter 63 and for other specific offenses which include distribution of misbranded, adulterated, unregistered, or unlabeled fertilizer.

The service has authority to take samples of fertilizer for analysis under section 63.091 of the code:

> § 63.091. Inspection and Sampling; Entry Power
>
> In order to determine if commercial fertilizer is in compliance with this chapter, the service is entitled to:
>
> > (1) enter during regular business hours and inspect <u>any place of business, mill, plant, building, or vehicle, and to open any bin, vat, or parcel, that is used in the manufacture, transportation, importation, sale, or storage of a commercial fertilizer or is suspected of containing a commercial fertilizer</u>; and
> >
> > (2) take samples from fertilizer found during that inspection. (Emphasis added.)

Agric. Code § 63.091. Each sample is sent to the service, with a report providing the following information:

> (1) the name or brand of commercial fertilizer sampled;
>
> (2) the serial number of the sample;
>
> (3) <u>the manufacturer or guarantor of the sample, if known</u>;
>
> (4) <u>the name of the person in possession of the lot samples</u> [sic];

(5) the date and place of taking the sample; and

(6) the name of the person who took the sample. (Emphasis added.)

Agric. Code § 63.093(b).

The service thus is authorized to take fertilizer samples from persons or entities other than the manufacturer. Section 63.093(b)(3) of the code indicates that the name of the manufacturer may be unknown, while section 63.093(b)(4) indicates that the person in possession of the lot sampled[1] may be different from the manufacturer. The service is entitled to enter "any place of business, mill, plant, building or vehicle," and may open any container "that is used in the manufacture, transportation, importation, sale, or storage of commercial fertilizer" or that is "suspected of containing a commercial fertilizer. . . ." Agric. Code § 63.093(b). Thus, the sample may have been taken from the manufacturer, transporter, seller, or purchaser of the fertilizer. Your letter states that the service routinely acquires samples of manufactured fertilizers as they appear in the marketplace.

The samples collected are analyzed by the Office of the State Chemist. See Agric. Code § 63.003(c) (appointment of a state chemist). If the service finds that a commercial fertilizer is in violation of a provision of chapter 63 of the Agriculture Code, it is required by section 63.094 to "notify the manufacturer or other person who caused the

---

1. Section 63.093(b)(4) should read as follows: "the name of the person in possession of the lot sampled. . . ." The prior version of section 63.093(b)(4) referred to the "lot sampled." Acts 1961, 57th Leg., ch. 27, § 8(b), (d), at 54, 58. Chapter 141 of the Agricultural Code, which regulates commercial feed, includes section 141.103 on identification of feed samples. Section 141.103, which is virtually identical to section 63.093 of the code, provides that the report to the service should contain "the name of the person in possession of the lot sampled. . . ." Agric. Code § 141.103(b)(4). (Emphasis added.) Chapters 63 and 141 of the Agricultural Code were amended by a single bill adopted by the 68th Legislature. Acts 1983, 68th Leg., ch. 349, at 1851. The small change in section 63.093(b)(4) appears to have resulted from a typographical error.

fertilizer to be distributed."  Agric. Code § 63.094(a). The manufacturer or distributor of the fertilizer then has an opportunity to have an independent analysis of the sample collected by the service.  Agric. Code § 63.094(b).

Your first question arises from the service's practice of sending purchasers of fertilizer a copy of the state chemist's analysis three days after sending it to the manufacturer.  You state that a fertilizer manufacturer maintains that this is an improper procedure because (1) the state has no statutory authority to inform the purchaser until remedies specified in section 63.094 have been exhausted and the issue has been resolved and (2) notification prior to resolution is a denial of the manufacturer's due process rights.  We will first consider the authority of the service to inform the purchaser of the chemical analysis prior to exhaustion of the remedies set out in section 63.094.

You have submitted copies of the notification sent to the manufacturer and then to the purchaser.  The cover letter states that, on the basis of an enclosed laboratory analysis report, the fertilizer is in violation of the Texas Commercial Fertilizer Control Act.  It requests the manufacturer to review all factors which might have resulted in this deficiency, invites it to supply additional information which will justify changing the conclusions of the report, and informs it that it may request an independent analysis.

The laboratory analysis report accompanying the cover letter states the percentages of chemical components guaranteed for the fertilizer and the percentages shown by analysis of the sample.  It includes the following statement:

> LABORATORY ANALYSIS DEMONSTRATES THIS PRODUCT TO BE EITHER DEFICIENT OR EXCESSIVE IN ONE OR MORE OF THE LABEL GUARANTEES HIGHLIGHTED ABOVE.
>
> THE SAMPLE RESULTS FALL OUTSIDE THE RANGE OF SAMPLING AND ANALYTICAL ERROR.  THE LOT OF PRODUCT IS THUS CONSIDERED TO BE IN VIOLATION OF THE ECONOMIC PROVISIONS OF THE TEXAS COMMERCIAL FERTILIZER CONTROL ACT.
>
> THE SAMPLE WILL BE RETAINED FOR FIFTEEN (15) CALENDAR DAYS FOLLOWING THE DATE OF THIS REPORT TO ALLOW THE MANUFACTURER TO REQUEST A PORTION FOR HIS OWN USE.  WITHIN THIS TIME,

THE MANUFACTURER IS FURTHERMORE PROVIDED THE OPPORTUNITY OF REQUESTING ANALYSIS BY TWO INDEPENDENT LABORATORIES SELECTED BY THE STATE CHEMIST. THE RESULTS OF SUCH INDEPENDENT ANALYSES WILL BE TAKEN INTO CONSIDERATION IN MAKING A FINAL DETERMINATION OF THE LEGAL STATUS OF THE SAMPLE. A CORRECTED REPORT WOULD BE ISSUED IF THE STATUS CHANGED. UNLESS CHANGED, THIS ANALYSIS WILL APPEAR AS A VIOLATIVE LISTING IN THE ANNUAL PUBLICATION OF THE OFFICE OF THE TEXAS STATE CHEMIST.

Much of the information set out in section 63.093(b) of the Agriculture Code appears on the analysis report, including the name of the manufacturer or guarantor and the name of the possessor. In both of the sample notices you submitted, copies of the cover letter and laboratory analysis report were sent to the entity identified as the possessor of the fertilizer lot from which the sample was taken. Thus, in these cases, the service took samples from the purchaser of the fertilizer, and then sent him the results of its analysis of those samples.

No provision of chapter 63 states that the service may or must send a copy of the report to the possessor or to the purchaser. We do not, however, believe express statutory authority is necessary for the service to send the purchaser or possessor of fertilizer its chemical analysis of that product.

In Terrell v. Sparks, 135 S.W. 519 (Tex. 1911), the Supreme Court of Texas stated as follows:

The grant of an express power carries with it by necessary implication every other power necessary and proper to the execution of the power granted. When the law commands anything to be done, it authorizes the performance of whatever may be necessary for executing its commands.

Terrell v. Sparks, 135 S.W. 521 (Tex. 1911) (quoting Sutherland on Statutory Construction, § 341). See Stauffer v. City of San Antonio, 344 S.W.2d 158 (Tex. 1961) (civil service commission does not have implied authority to resolve fact questions of fireman's fitness for reinstatement). In Bullock v. Calvert, 480 S.W.2d 367 (Tex. 1972) the court stated that

> every specific, permissible act of a public
> officer need not be expressed in a statute; we
> imply the authority to do those acts necessary
> to achieve the power or object expressly
> granted, because the Legislature must have
> intended to grant the constituent details
> within the larger commission.

Bullock v. Calvert, 480 S.W.2d 372 (Tex. 1972) (dicta, no statute authorized secretary of state to spend state funds to conduct party primary elections).

In Sexton v. Mount Olivet Cemetary Association, 720 S.W.2d 129 (Tex. App. - Austin 1986, writ ref'd n.r.e.), the court stated that the legislature generally intends that an agency should have by implication such authority as is necessary to carry out specific powers and duties, so that the statutory purpose might be achieved.

We would not expect a state agency to have express authority to engage in correspondence relevant to its duties or to send copies of its correspondence to interested persons. See generally V.T.C.S. art. 6252-17a, § 6(15) (information available to public by agency policy as of the effective date of the Texas Open Records Act). In our opinion, the service has implied authority based on sections 63.091, 63.093, and 63.094 of the Agriculture Code to send a copy of the laboratory report to the purchaser or possessor of the fertilizer. The person from whom the service has obtained the fertilizer and who is identified in the report accompanying the sample as the possessor of the fertilizer sampled has a special interest in learning the result of the analysis. The purchaser, if different from the possessor, is similarly interested in that information. No provision of chapter 63 requires the service to keep the fertilizer analysis a secret from everyone but the manufacturer. Compare Agric. Code § 63.094 with Agric. Code § 63.095 (any person may initiate submission of sample for analysis, results may not identify manufacturer and may not be published). See also Agric. Code § 63.005(a)(2) (at least annually, director shall make public results of analysis of fertilizer samples). In sending the purchaser or possessor a copy of the analysis report, the service provides information generated by its inspection and testing powers to parties who were involved in the exercise of those powers and who have a significant interest in the results of the testing.

This practice of the service helps carry out the purposes of chapter 63. When the Texas Fertilizer Control

Act was adopted in 1961, it included the following emergency clause:

> The fact that present laws are not adequate to regulate the manufacture and distribution of commercial fertilizers in Texas; the fact that consumers need uniform guarantees and labeling of fertilizers which are offered to them; and the further fact that it would be of great material advantage to have the laws of Texas conform insofar as practicable with the present day practices of consumers, manufacturers and distributors of commercial fertilizer, _and to afford maximum protection to consumers of commercial fertilizers_, create an emergency. . . . (Emphasis added.)

Acts 1961, 57th Leg., ch. 37, § 19, at 54, 61-62. An emergency clause may be considered if it will aid the court in ascertaining the legislative intent. _Trawalter v. Schaefer_, 179 S.W.2d 765 (Tex. 1944); Gov't Code § 311.023(7). A related purpose is stated in the bill analysis for House Bill No. 1510 of the 68th Legislature, the bill which adopted the present version of chapter 63 of the Agriculture Code. The bill analysis states the following as background information:

> The guaranteed quality of commercial feeds and fertilizers are essential for the successful operation of the agricultural and livestock industries of Texas. Texas A & M University, through the Agricultural Experiment Station, is charged with the regulatory responsibility of guaranteeing of the labeling accuracy and ingredient quality of these products as well as pet foods and homeowner products.

House Committee on Agriculture and Livestock, Bill Analysis to H.B. No. 1510, 68th Leg. (1983). _See_ Gov't Code § 311.023(3) (in construing a statute, court may consider legislative history).

Informing the purchaser or possessor of fertilizer of the laboratory analysis report will help carry out the legislative purpose of protecting consumers. The purchaser or possessor can refrain from applying the fertilizer to the soil if it has not yet been applied. If it has been, he has an opportunity to determine whether supplemental applications should be made to correct the balance of plant nutrients in the soil.

Your letter states that original findings are mailed to the purchaser three days after the mailout to the manufacturer so that the manufacturer will have an opportunity to initiate a monetary settlement with the purchaser. By informing the purchaser of the original findings, the service encourages manufacturers to be responsible for the quality of their products and to be accountable to consumers. In this way, the consumer protection purposes of chapter 63 are carried out. See Gov't Code § 311.021(5) (in construing a statute, a public interest is favored over a private interest).

We note that the predecessor to section 63.094(a) provided that, in case the fertilizer was found in violation of chapter 63,

> the director shall notify the manufacturer or other person who caused the fertilizer to be distributed and the consignee. (Emphasis added.)

Acts 1981, 67th Leg., ch. 388, at 1012, 1147 (adopting Agriculture Code). The "consignee" is not the purchaser or consumer, but the person to whom the product is delivered for transportation or sale. Webster's Third New International Dictionary; see Charles M. Stieff, Inc. v. City of San Antonio, 111 S.W.2d 1086 (Tex. 1938) (defining "consignment" and "consigned"). The deletion of the mandatory requirement that the consignee be notified does not demonstrate any legislative intention to restrict the service's implied authority to send purchasers of fertilizer and possessors of the lots sampled copies of the analysis report. We conclude that the service has implied statutory authority to send copies of laboratory analysis reports to the purchaser of the fertilizer that was tested.

We next consider whether the due process clauses of the United States and Texas Constitutions entitle the fertilizer manufacturer to notice and a hearing before the laboratory report is sent to the purchaser of the fertilizer. The Fifth and Fourteenth Amendments to the United States Constitution and article I, section 19, of the Texas Constitution prevent the state from depriving persons of property or liberty without due process of law. The manufacturer is a corporation and not a natural person and thus cannot claim due process protection for the liberty guaranteed by the Fourteenth Amendment or by article I, section 19, of the Texas Constitution. Pierce v. Society of Sisters, 268 U.S. 510 (1925); Western Turf Association v. Greenberg, 204 U.S. 359 (1907); Northwestern National Life

Insurance Co. v. Riggs, 203 U.S. 243 (1906); Annot. 47 L.Ed.2d 975, 984 (1975).

The reputation of a natural personal person is analyzed as a liberty interest rather than a property interest under the due process clause. See Wisconsin v. Constantineau, 400 U.S. 433 (1971). Even if the manufacturer were a natural person who could invoke due process protection for a liberty interest, and if the transmittal of the fertilizer analysis to his customer could be considered damaging to his reputation, the due process clause would not afford him the notice and hearing he seeks. In Paul v. Davis, 424 U.S. 693 (1976), the Supreme Court considered whether a citizen's charge of defamation stated a claim for relief under 42 U.S.C. § 1983 and the Fourteenth Amendment. The Supreme Court held that city and county police officials did not violate the plaintiff's due process rights when they circulated to local area merchants a circular that described him as an "active shoplifter." The Supreme Court held that reputation alone, apart from some more tangible interests such as employment, was neither a liberty nor property interest sufficient to invoke the procedural protection of the due process clause. 424 U.S. at 711-712. See Marrero v. City of Hialeah, 625 F.2d 499 (5th Cir. 1980) (injuries to personal and business reputations caused by unlawful search and seizure are compensable under 42 U.S.C. § 1983 as element of damages). The court moreover said that the due process clause does not extend a person the right to be free of injury "wherever the State may be characterized as the tortfeasor." 424 U.S. 701.

We next consider whether the manufacturer has a property interest which would invoke the protection of the due process clause.

Property interests are not created by the United States Constitution, but are created and defined by rules or understandings that derive from an independent source such as state law. Ruckelshaus v. Monsanto Co., 467 U.S. 986 (1984) (trade secrets); Board of Regents v. Roth, 408 U.S. 564 (1972) (public employment). Intangible interests, such as contracts, liens, and trade secrets, have been recognized as property rights entitled to constitutional protection. Ruckelshaus v. Monsanto Co., supra (information recognized as trade secrets under Missouri law constitutes property protected by Fifth Amendment's taking clause).

The manufacturer in this case asserts a property interest in good will. Texas courts have recognized good will as property which consists of the advantage or benefit

acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the patronage of habitual customers which it receives

> on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

Taormina v. Culicchia, 355 S.W.2d 569, 573 (Tex. Civ. App. - El Paso 1962, writ ref'd n.r.e.); see Texas & Pacific Railway v. Mercer, 90 S.W.2d 557 (Tex. 1936). The owner may recover damages for the destruction of good will. Texas & Pacific Railway Co. v. Mercer, supra. Good will is not, however, compensable as a separate and independent item of recovery when the state takes land occupied by a business in eminent domain proceedings. State v. Zaruba, 418 S.W.2d 499 (Tex. 1967); City of Dallas v. Priolo, 242 S.W.2d 176 (Tex. 1951). Nor is the good will of a physician's medical practice considered to be property subject to division upon divorce. Nail v. Nail, 486 S.W.2d 761 (Tex. 1972).

Texas courts have moreover held that both liberty interests and property interests are held subject to the exercise of the state's police power. City of College Station v. Turtle Rock Corp., 680 S.W.2d 802 (Tex. 1984) (alleged taking of property); City of New Braunfels v. Waldschmit, 207 S.W. 303 (Tex. 1918); Houston & Texas Cent. Railway v. Dallas, 84 S.W. 648 (Tex. 1905). State police power is grounded upon the public need for safety, healthy security, and protection of the general welfare of the community. Jefco, Inc. v. Lewis, 520 S.W.2d 915 (Tex. Civ. App. - Austin 1975, writ ref'd n.r.e.). The wisdom of the exercise of the police power is largely for legislative rather than judicial determination. Id. at 922.

Sending the fertilizer analysis report to the purchaser is, in our opinion, a reasonable exercise of police power to protect the general welfare by protecting consumers from mislabeled products and by limiting damage to the agriculture of Texas that might result from distribution and application of mislabeled fertilizer. The purchaser is also informed of the manufacturer's right to have an independent analysis of the fertilizer and of the possibility that a corrected report might be issued. This information should minimize the effects on the manufacturer's customer relations, if any, caused by sending the laboratory report to the customer. We believe the Texas courts would hold that

good will does not include patronage attributable to the consumer's ignorance of possible product deficiencies discovered by the legislatively authorized testing program set out in chapter 63 of the Agriculture Code. See generally Open Records Decision No. 48 (1974) (section 3(a)(4) of the Open Records Act does not protect competitive situation based on public ignorance of content or wholesomeness of food products). Cf. International Business Machines Corporation v. United States of America, 298 U.S. 131 (1936) (no exception to Clayton Act for trying clause directed at protecting good will).

Since we conclude that no property interest is affected by governmental action in this case, we need not decide whether the review procedures set out in section 63.094 would accord due process. See, e.g., Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594 (1950) (due process clause not violated by federal statute authorizing seizure of misbranded articles upon agency finding, made without hearing, of probable cause that misbranded article was dangerous to health or that labeling was fraudulent or misleading to the injury and damage of consumer); Buttfield v. Stranahan, 192 U.S. 470 (1904) (no deprivation of property without due process in tea examiner's summary seizure of imported tea based on his judgment that its quality did not meet federal standards for wholesomeness); Annot. 69 L.Ed.2d 1044 (1981) (application of due process guarantees to summary administrative deprivation of property interest).

Your second question is:

> Whether the Director of the Texas Agricultural Experiment Station is compelled to give equal weight to analytical findings of commercial laboratories when a manufacturer contests the results of the state chemist.

Section 63.094 of the Agriculture Code provides in part:

> (b) After receiving a notice under Subsection (a) of this section, the manufacturer or other person who caused the fertilizer to be distributed may request that the service submit portions of the sample analyzed to other chemists for independent analysis. After receiving a request, the service shall submit two portions of the sample analyzed to two qualified chemists selected by the

service. If requested, the service shall also submit one portion of the sample to the person requesting independent analysis. A request under this subsection must be filed with the service before the 16th day following the day on which notice is given.

(c) Each of the chemists selected by the service under Subsection (b) of this section shall analyze the portion of the sample and certify findings to the service under oath. The findings shall be prepared in duplicate and the service shall forward one copy of each chemist's findings to the person who requested independent analysis.

(d) The three chemical analyses obtained under this section may be considered in determining whether a violation of this chapter has occurred. (Emphasis added.)

Agric. Code § 63.094. Section 63.094(d) does not dictate the weight to be accorded any of the three analyses in determining whether a violation of chapter 63 has occurred. Nor does it state that the analysis results will be dispositive of any question as to violation. It merely authorizes the use of the three chemical analyses in proceedings to determine whether a violation of chapter 63 has occurred. See Webster's Ninth New Collegiate Dictionary (1983) ("may" used nearly interchangeably with "can"). See also Agric. Code subch. G, H (administrative and judicial proceedings for enforcing chapter 63). Neither the director of the Texas Agricultural Experiment Station nor any court that hears a case alleging violation of chapter 63 is compelled by section 63.094 of the Agricultural Code to give equal weight to analytical findings of commercial laboratories when a manufacturer has requested independent analysis of fertilizer samples pursuant to section 63.094(b).

### S U M M A R Y

The Texas Feed and Fertilizer Control Service has implied authority to notify the possessor or purchaser of fertilizer that laboratory analysis of the product demonstrates it to be out of compliance with the requirements of chapter 63 of the Agriculture Code. By sending this notification to the purchaser or possessor, the service does not

deprive the fertilizer manufacturer of property without due process of law. Section 63.094(d) of the Agriculture Code does not require that equal weight be given to analytical findings of commercial laboratories when a manufacturer contests the results of the state chemist's analysis.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Susan L. Garrison
Assistant Attorney General